13-422-cv
The New York Times Company v. United States

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2013

Submitted: October 1, 2013          Decided: June 23, 2014

Docket Nos. 13-422(L), 13-445(Con)

- - - - - - - - - - - - - - - - - - - - - - - -
THE NEW YORK TIMES COMPANY, CHARLIE SAVAGE,
SCOTT SHANE, AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,
    Plaintiffs-Appellants,


            v.


UNITED STATES DEPARTMENT OF JUSTICE, UNITED
STATES DEPARTMENT OF DEFENSE, CENTRAL
INTELLIGENCE AGENCY,
    Defendants-Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, CABRANES, and POOLER, Circuit Judges.

Appeal from the January 24, 2013, judgment of the United States District Court for the Southern District of New York (Colleen McMahon, District Judge), dismissing, on motion for summary judgment, a suit under the Freedom of Information Act seeking documents relating to targeted killings of United States citizens carried out by drone aircraft.

We conclude that (1) a redacted version of the OLC-DOD

1

Memorandum must be disclosed, (2) a redacted version of the classified <u>Vaughn</u> index (described below) submitted by OLC must be disclosed, (3) other legal opinions prepared by OLC must be submitted to the District Court for in camera inspection and determination of waiver of privileges and appropriate redaction,[1] (4) the <u>Glomar</u> and "no number, no list" responses are insufficiently justified, (5) DOD and CIA must submit <u>Vaughn</u> indices to the District Court for <u>in camera</u> inspection and determination of appropriate disclosure and appropriate redaction, and (6) the OIP search was sufficient. We therefore affirm in part, reverse in part, and remand.

<div style="margin-left:40%;">

David E. McCraw, The New York Times Company, New York, N.Y. (Stephen N. Gikow, New York, N.Y., on the brief), for Plaintiffs-Appellants The New York Times Company, Charlie Savage, and Scott Shane.

Jameel Jaffer, American Civil

</div>

---

[1] The double underlined portions of this sealed opinion are passages that have been redacted from the publicly available opinion filed today. These portions appear with double underlining to assist those involved in any further review in easily identifying the redactions from the publicly available opinion that were made at the request of the Government to preserve its opportunities for further appellate review.

Liberties Union Foundation, New York, N.Y. (Hina Shamsi, Brett Max Kaufman, American Civil Liberties Union Foundation, New York, N.Y., Joshua Colangelo-Bryan, Dorsey & Whitney LLP, New York, N.Y., Eric Ruzicka, Colin Wicker, Dorsey & Whitney LLP, Minneapolis, M.N., on the brief), for Plaintiffs-Appellants American Civil Liberties Union and American Civil Liberties Union Foundation.

Sharon Swingle, U.S. Appellate Staff Atty., Washington, D.C. (Preet Bharara, U.S. Atty., Sarah S. Normand, Asst. U.S. Atty., New York, N.Y., Stuart F. Delery, Acting Asst. U.S. Atty. General, Washington, D.C., on the brief), for Defendants-Appellees.

(Bruce D. Brown, Mark Caramanica, Aaron Mackey, The Reporters Committee for Freedom of Press, Arlington, V.A., for amicus curiae The Reporters Committee for Freedom of Press, in support of Plaintiffs-Appellants.)

(Marc Rotenberg, Alan Butler, Ginger McCall, David Brody, Julia Horwitz, Electronic Privacy Information Center, Washington, D.C., for amicus curiae Electronic Privacy Information Center, in support of Plaintiffs-Appellants.)

JON O. NEWMAN, Circuit Judge:

This appeal of a judgment dismissing challenges to denials

of requests under the Freedom of Information Act ("FOIA")

presents important issues arising at the intersection of the public's opportunity to obtain information about their government's activities and the legitimate interests of the Executive Branch in maintaining secrecy about matters of national security. The issues assume added importance because the information sought concerns targeted killings of United States citizens carried out by drone aircraft. Plaintiffs-Appellants The New York Times Company and New York Times reporters Charlie Savage and Scott Shane (sometimes collectively "N.Y. Times"), and the American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively "ACLU") appeal from the January 24, 2013, judgment of the United States District Court for the Southern District of New York (Colleen McMahon, District Judge) dismissing, on motions for summary judgment, their consolidated FOIA suits. See New York Times Co. v. U. S. Dep't of Justice ("Dist. Ct. Op."), 915 F. Supp. 2d 508 (S.D.N.Y. 2013). The suits were brought against the Defendants-Appellees United States Department of Justice ("DOJ"), the United States Department of Defense ("DOD"), and the Central Intelligence

4

Agency ("CIA") (sometimes collectively the "Government").

We emphasize at the outset that the Plaintiffs' lawsuits do not challenge the lawfulness of drone attacks or targeted killings. Instead, they seek information concerning those attacks, notably, documents prepared by DOJ's Office of Legal Counsel ("OLC") setting forth the Government's reasoning as to the lawfulness of the attacks.

The issues primarily concern the validity of FOIA responses that (a) decline to reveal even the existence of any documents responsive to particular requests (so-called "Glomar responses" (described below)), (b) acknowledge the existence of responsive documents but decline to reveal either the number or description of such documents (so-called "no number, no-list" responses (described below)), (c) assert various FOIA exemptions or privileges claimed to prohibit disclosure of various documents that have been publicly identified, notably the OLC-DOD Memorandum and other OLC legal opinions, and (d) challenge the adequacy of a FOIA search conducted by one office of DOJ.

We conclude that (1) a redacted version of the OLC-DOD

Memorandum must be disclosed, (2) a redacted version of the classified Vaughn index (described below) submitted by OLC must be disclosed, (3) other legal opinions prepared by OLC must be submitted to the District Court for in camera inspection and determination of waiver of privileges and appropriate redaction, (4) the Glomar and "no number, no list" responses are insufficiently justified, (5) DOD and CIA must submit Vaughn indices to the District Court for in camera inspection and determination of appropriate disclosure and appropriate redaction, and (6) the Office of Information Policy ("OIP") search was sufficient. We therefore affirm in part, reverse in part, and remand.

## Background

The FOIA requests at issue in this case focus primarily on the drone attacks in Yemen that killed Anwar al-Awlaki[2] and Samir Khan in September 2011 and al-Awlaki's teenage son, Abdulrahman al-Awlaki, in October 2011. All three victims were United States

---

[2] This spelling, which we adopt (except in quotations), is used by the District Court and in the Government's brief. The briefs of N.Y. Times and ACLU and numerous documents in the record render the name "al-Aulaqi."

6

citizens either by birth or naturalization.

Statutory Framework. FOIA provides, with exceptions not relevant to this case, that an "agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A) (2013). FOIA contains several exemptions, three of which are asserted in this case.

Exemption 1 exempts records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (2013). Executive Order 13526 allows an agency to withhold information that (1) "pertains to" one of the categories of information specified in the Executive order, including "intelligence activities (including covert action)," "intelligence sources or methods," or "foreign relations or foreign activities of the United States" and (2) if "unauthorized disclosure of the information could reasonably be

7

expected to cause identifiable and describable damage to the national security." Executive Order No. 13526 § 1.1(a)(3)-(4), 1.4(c)-(d), 75 Fed. Reg. 708, 709 (Dec. 29, 2009).

Exemption 3 exempts records that are "specifically exempted from disclosure by [another] statute" if the relevant statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(i), (ii) (2013). Two such statutes are potentially relevant here. The Central Intelligence Agency Act of 1949, as amended, provides that the Director of National Intelligence "shall be responsible for protecting intelligence sources or methods," and exempts CIA from "any other law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507 (2013). The National Security Act of 1947, 50 U.S.C. § 3024-1(i)(1) (2013), exempts from disclosure "intelligence sources and methods."

Exemption 5 exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (2013). Exemption 5 encompasses traditional common law privileges against disclosure, including the attorney-client and deliberative process privileges. See National Council of La Raza v. Dep't of Justice, 411 F.3d 350, 356 (2d Cir. 2005).

The N.Y. Times FOIA requests and Government responses. Shane and Savage, New York Times reporters, submitted separate FOIA requests to OLC. Shane's request, submitted in June 2010, sought:

> all Office of Legal Counsel opinions or memoranda since 2001 that address the legal status of targeted killings, assassination, or killing of people suspected of ties to Al-Qaeda or other terrorist groups by employees or contractors of the United States government.

Joint Appendix ("JA") 296-97.

> Savage's request, submitted in October 2010, sought:

> a copy of all Office of Legal Counsel memorandums analyzing the circumstances under which it would be lawful for United States armed forces or intelligence

9

community assets to target for killing a United States citizen who is deemed to be a terrorist.

JA 300-01.

OLC denied Shane's request. With respect to the portion of his request that pertained to DOD, OLC initially submitted a so-called "no number, no list" response[3] instead of submitting the usual <u>Vaughn</u> index,[4] numbering and identifying by title and description documents that are being withheld and specifying the FOIA exemptions asserted. A no number, no list response acknowledges the existence of documents responsive to the request, but neither numbers nor identifies them by title or description. OLC said that the requested documents pertaining to DOD were being withheld pursuant to FOIA exemptions 1, 3, and 5.

As to documents pertaining to agencies other than DOD, OLC

---

[3] The term was apparently coined by CIA, <u>see</u> <u>Bassiouni v. CIA</u>, 392 F.3d 244, 246 (7th Cir. 2004), and the CIA's use of no number, no list responses to FOIA requests has been considered by district courts in the District of Columbia. <u>See</u> <u>National Security Counselors v. CIA</u>, 898 F. Supp. 2d 233, 284-85 (D.D.C. 2012); <u>Jarvik v. CIA</u>, 741 F. Supp. 2d 106, 123 (D.D.C. 2010).

[4] The term derives from <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973).

submitted a so-called "Glomar response."[5]  This type of response neither confirms nor denies the existence of documents responsive to the request. See Wilner v. National Security Agency, 592 F.3d 60, 68 (2d Cir. 2009).  OLC stated that the Glomar response was given "because the very fact of the existence or nonexistence of such documents is itself classified, protected from disclosure by statute, and privileged" under 5 U.S.C. § 552(b)(1), (3), (5). CIA confirmed that it requested DOJ to submit a Glomar response on its behalf.[6]

OLC also denied Savage's request.  Declining to submit either a Vaughn index or even a no number, no list response, OLC submitted a Glomar response, stating that, pursuant to Exemptions 1, 3, and 5, it was neither confirming nor denying the existence

---

[5] The term derives from the Hughes Glomar Explorer, a vessel built to recover a sunken Soviet submarine. See Phillippi v. CIA, 546 F.2d 1009, 1010-12 (D.C. Cir. 1976).  A Glomar response was first used in 1992 in a case challenging a Government agency's refusal to confirm or deny the existence of certain materials requested under FOIA, see Benavides v. DEA, 968 F.2d 1243, 1245 (D.C. Cir. 1992).

[6] CIA made one exception to its request that OLC submit a Glomar response.  Because CIA's involvement in the operation that resulted in the death of Osama bin Laden had been acknowledged and was not classified, the agency asserted that any OLC documents related to the agency's involvement in that operation would not be covered by a Glomar response, but added that there were no such documents.

11

of documents described in the request. Unlike its letter denying the Shane request, OLC's response to the Savage request did not identify any responsive documents relating to DOD.

During the course of the litigation, OLC modified its responses to the Shane and Savage requests by identifying the existence of one document pertaining to DOD, what the District Court and the parties have referred to as the OLC-DOD Memorandum, but claimed that this document was exempt from disclosure under Exemption 5. Because the OLC-DOD Memorandum was classified, it was presumably also withheld under Exemption 1. As to all other DOD documents, it is not clear whether OLC was continuing to assert a Glomar response, as it had made to Shane, or a no number, no list response, as it had made to Savage.

The ACLU FOIA requests and Government responses. In October 2011, ACLU submitted FOIA requests to three agencies: DOJ (including two of DOJ's component agencies, OIP and OLC), DOD, and CIA. The requests, quoted in the margin,[7] sought

_____

[7]
1. All records created after September 11, 2001, pertaining to the legal basis in domestic, foreign, and international law upon which U.S. citizens can be subjected to targeted killings, whether using unmanned aerial vehicles ("UAVs" or

12

"drones) or by other means.

2. All records created after September 11, 2001, pertaining to the process by which U.S. citizens can be designated for targeted killings, including who is authorized to make such determinations and what evidence is needed to support them.

3. All memoranda, opinions, drafts, correspondence, and other records produced by the OLC after September 11, 2001, pertaining to the <u>legal basis in domestic, foreign, and international law</u> upon which the targeted killing of Anwar al-Awlaki was authorized and upon which he was killed, including discussions of:

> A. The reasons why domestic-law prohibitions on murder, assassination, and excessive use of force did not preclude the targeted killing of al-Awlaki;
>
> B. The protection and requirements imposed by the Fifth Amendment Due Process Clause;
>
> C. The reasons why International-law prohibitions on extrajudicial killing did not preclude the targeted killing of al-Awlaki;
>
> D. The applicability (or non-applicability) of the Treason Clause to the decision whether to target al-Awlaki;
>
> E. The legal basis authorizing the CIA, JSOC, or other U.S. Government entities to carry out the targeted killing of Anwar Al-Awlaki;
>
> F. Any requirement for proving that al-Awlaki posed an imminent risk of harm to others, including an explanation of how to define imminence in this context; and
>
> G. Any requirement that the U.S. Government first attempt to capture Al-Awlaki before killing him.

13

4. All documents and records pertaining to the <u>factual basis</u> <u>for the targeted killing</u> of Al-Awlaki, including:

    A. Facts supporting a belief that al-Awlaki posed an imminent threat to the United States or United States interests;

    B. Facts supporting a belief that al-Awlaki could not be captured or brought to justice using nonlethal means;

    C. Facts indicating that there was a legal justification for killings persons other than al-Awlaki, including other U.S. citizens, while attempting to kill al-Awlaki himself;

    D. Facts supporting the assertion that al-Awlaki was operationally involved in al Qaeda, rather than being involved merely in propaganda activities; and

    E. Any other facts relevant to the decision to authorize and execute the targeted killings of al-Awlaki.

5. All documents and records pertaining to the <u>factual basis</u> <u>for the killing</u> of Samir Khan, including whether he was intentionally targeted, whether U.S. Government personnel were aware of his proximity to al-Awlaki at the time the missiles were launched at al-Awlaki's vehicle, whether the United States took measures to avoid Khan's death, and any other facts relevant to the decision to kill Khan or the failure to avoid causing his death.

6. All documents and records pertaining to the <u>factual basis</u> <u>for the killing</u> of Abdulrahman al-Awlaki, including whether he was intentionally targeted, whether U.S. Government personnel were aware of his presence when they launched a missile or missiles at his location, whether he was targeted on the basis of his kinship with Anwar al-Awlaki, whether the United States took measures to avoid his death, and any

14

various documents concerning the targeted killings of United States citizens in general and al-Awlaki, his son, and Khan in particular.

Both OLC and CIA initially submitted <u>Glomar</u> responses, refusing to confirm or deny the existence of responsive documents, pursuant to Exemptions 1, 3, and 5.

DOD initially stated that it could not respond to the request within the statutory time period because of the scope and complexity of the request.

During the course of the litigation, the Government agencies modified their original responses in light of statements by senior Executive Branch officials on the legal and policy issues pertaining to United States counterterrorism operations and the potential use of lethal force by the United States Government against senior operational leaders of al-Qaeda who are United States citizens.

OLC provided ACLU with a <u>Vaughn</u> index of sixty unclassified

---

other factors relevant to the decision to kill him or the failure to avoid causing his death.

JA 252-53.

responsive documents, each described as an e-mail chain reflecting internal deliberations concerning the legal basis for the use of lethal force against United States citizens in a foreign country in certain circumstances. OLC withheld these documents pursuant to Exemption 5.

OLC also submitted a no number, no list response as to classified documents, stating that it could not provide the number or description of these documents because that information was protected from disclosure by Exemptions 1 and 3. OLC did describe one of these documents as an "OLC opinion related to DoD operations," Declaration of John E. Bies, Deputy Assistant Attorney General, OLC ¶ 38 ("Bies Decl."), JA 279, which it withheld in its entirety under Exemptions 1 and 3. This is apparently not the OLC-DOD Memorandum, which OLC said was exempt from disclosure under Exemption 5. That this document is not the OLC-DOD Memorandum is confirmed by OLC's assertion that this document "cannot be further identified or described on the public record." Id. The OLC-DOD Memorandum was withheld under Exemptions 1 and 5.

OIP located one responsive document, a set of talking points

16

prepared for the Attorney General and others related to "hypothetical questions about Anwar al-Aulaqi's death," Declaration of Douglas R. Hibbard, Deputy Chief of the Initial Request Staff, OIP ¶ 8, JA 441, which it released to ACLU. OIP also issued a <u>Vaughn</u> index listing four unclassified records withheld under Exemptions 3, 5, and 6.[8] OIP also submitted a no number, no list response to various classified documents withheld under Exemptions 1 and 3.

DOD's revised response disclosed a speech given by Jeh Johnson, then-DOD General Counsel, at Yale Law School on February 22, 2012. DOD also provided ACLU with a <u>Vaughn</u> index listing ten unclassified records, withheld pursuant to Exemption 5. Seven of those documents were e-mail traffic regarding drafts of the speech given by Johnson at Yale Law School and a speech delivered by Attorney General Holder at Northwestern University School of Law. One of the withheld unclassified records was a presentation by Johnson in February 2012, regarding international law

---

[8] Exemption 6, which is not in issue in this appeal, applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (2013).

principles, to officers who had recently obtained the rank of O-7. The remaining two withheld unclassified records were described as "memoranda from the Legal Counsel to the Chairman of the Joint Chiefs of Staff to the White House's National Security Council Legal Advisor addressing the legal basis for conducting military operations against U.S. citizens in general." Declaration of Robert E. Neller, Lt. General, United States Marine Corp, Director of Operations for the Joint Staff at the Pentagon, ¶ 16 ("Neller Decl."). JA 334.

DOD also located responsive classified records. One of these was the previously mentioned OLC-DOD memorandum, which DOD withheld under Exemptions 1 and 5. As to the other classified documents, DOD submitted a no number, no list response.

CIA modified its initial <u>Glomar</u> responses in June 2012 by confirming the existence of "responsive records reflecting a general interest" in two areas described in the ACLU's request: (1) "'the legal basis . . . upon which U.S. citizens can be subjected to targeted killing'" and (2) "'the process by which U.S. citizens can be subjected to targeted killing.'" Declaration

of John Bennett, Director, National Clandestine Service, CIA, ¶ 27 (quoting ACLU request).  In these two categories, CIA submitted a no number, no list response, relying on Exemptions 1 and 3, with the exception that CIA acknowledged that it possessed copies of speeches given by the Attorney General at Northwestern University Law School on March 5, 2012, and by the Assistant to the President for Homeland Security and Counterterrorism on April 30, 2012. See id.

The pending lawsuit and District Court opinions.  In December 2011, N.Y. Times filed a lawsuit challenging the denials of the Shane and Savage requests.  ACLU filed its suit in February 2012.  After the suits were consolidated, both Plaintiffs and the Government filed cross-motions for summary judgment.  In January 2013, the District Court denied both Plaintiffs' motions for summary judgment and granted the Defendants' motion in both cases, with one exception, which required DOD to submit a more detailed justification as to why the deliberative process exemption (asserted through Exemption 5) applied to two unclassified memos listed in its Vaughn index.

19

See Dist. Ct. Op., 915 F. Supp. 2d at 553. Later in January 2013, after receiving a supplemental submission from DOD, the District Court granted the Defendants' motion for summary judgment with respect to the two unclassified DOD memos. See New York Times Co. v. U. S. DOJ ("Dist. Ct. Supp. Op."), Nos. 11 Civ. 9336, 12 Civ. 794, 2013 WL 238928 (S.D.N.Y. Jan. 22, 2013).

In its principal opinion, which we discuss in more detail in Parts III and IV, below, the Court first ruled that the Government had conducted an adequate search for responsive documents. See Dist. Ct. Op., 915 F. Supp. 2d at 532-33. The Court then considered separately each of the Government's claims to an exemption.

As to Exemption 1, concerning properly classified documents, the Court first ruled that there was no evidence that any of the documents withheld pursuant to Exemption 1 had not been properly classified. See id. at 535. The Court specifically considered the Plaintiffs' claim that legal analysis could not be classified and rejected the claim. See id.

Turning to the Plaintiffs' claim of waiver, the Court,

20

citing Wilson v. CIA, 586 F.3d 171, 186 (2d Cir. 2009), first ruled that waiver of Exemption 1 had not occurred with respect to classified documents containing operational details of targeted killing missions. See Dist. Ct. Op., 915 F. Supp. 2d at 535-37.  The Court then specifically considered whether waiver of Exemption 1 had occurred with respect to the OLC-DOD Memorandum and rejected the claim. See id. at 538.

As to Exemption 3, which protects records exempted from disclosure by statute, the District Court first noted that section 102A(i)(1) of the National Security Act, now codified at 50 U.S.C. § 3024(i)(1) (2013), is an exempting statute within the meaning of Exemption 3, and that this provision protects from disclosure "intelligence sources and methods." Id. at 539.  The Court then reckoned with ACLU's contention that placing individuals on kill lists does not fall within the category of intelligence sources and methods.  Agreeing with a decision of a district court in the District of Columbia, ACLU v. Dep't of Justice, 808 F. Supp. 2d 280, 290-92 (D.D.C. 2011) ("Drone Strike Case"), which was later reversed on appeal, see ACLU v. CIA, 710

21

F.3d 422 (D.C. Cir. 2013), the District Court here rejected ACLU's argument. See Dist. Ct. Op., 915 F. Supp. 2d at 540. The District Court then specifically focused on the issue whether legal analysis could fall within the category of intelligence sources and methods. Acknowledging that it is "entirely logical and plausible" that intelligence sources and methods could be redacted from legal analysis upon in camera inspection, the Court declined to make such inspection or resolve the issue because it concluded that Exemption 5 "plainly applies" to the legal analysis that is sought here. See id.

The District Court then determined that section 6 of the CIA Act, 50 U.S.C. § 403g, now codified at 50 U.S.C. § 3507 (2013), is an exempting statute within the meaning of Exemption 3 and that section 6 protects from disclosure information concerning the "functions" of CIA. See id. at 541. Again, following the district court decision in the Drone Strike Case, before it was reversed, the District Court here ruled that Exemption 3 permitted CIA, in response to ACLU's request, to refuse to reveal the existence of records concerning drone strikes. See id.

22

As to Exemption 5, covering "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," the District Court noted that this exemption applies to documents withheld "under the deliberative process privilege (a.k.a., the executive privilege) and the attorney-client privilege," citing this Court's decision in Tigue v. U.S. Dep't ofJustice, 312 F.3d 70, 76 (2d Cir. 2002). See Dist. Ct. Op., 915 F. Supp. 2d at 541-42. OLC relied on the deliberative process privilege to withhold the classified OLC-DOD Memorandum, which both Plaintiffs sought, and DOD relied on this privilege to withhold the two unclassified documents on its Vaughn index that ACLU requested. These two, numbered 9 and 10, were described as "Memorandum from Legal Counsel to Chairman of the Joint Chiefs of Staff to the National Security Legal Advisor with legal analysis regarding the effect of U.S. citizenship on targeting enemy belligerents." JA 409.

With respect to the OLC-DOD Memorandum, the District Court, accepting N.Y. Times's concession that this document at one time might have been properly withheld under the deliberative process

and/or attorney-client privileges, see id. at 544, rejected the Plaintiffs' contentions that these privileges had been lost because of one or more of the following principles: waiver, adoption, or working law, see id. at 546-50.

As to documents 9 and 10 on DOD's Vaughn index, the Court initially found DOD's justification for invoking Exemption 5 inadequate, see id. at 545, but ruled that a subsequent submission sufficiently supported the application of the deliberative process privilege and hence Exemption 5 to these documents, see Dist. Ct. Supp. Op., 2013 WL 238928, at *1.

Finally, the District Court considered the Glomar and no number, no list responses that were given by DOJ, DOD, and CIA. Apparently accepting the sufficiency of the affidavits submitted by officials of these agencies to justify the responses under Exemptions 1 and 3, the Court turned its attention to the Plaintiffs' claims that these protections had been waived. Again, following the district court opinion in the Drone Strike Case, before it was reversed, the District Court here concluded that none of the public statements of senior officials waived

entitlement to submit <u>Glomar</u> or no number, no list responses because "[i]n none of these statements is there a reference to any particular records pertaining to the [targeted killing] program, let alone the <u>number</u> or <u>nature</u> of those records." <u>Dist. Ct. Op.</u>, 915 F. Supp. 2d at 553 (emphases in original).

<u>Information made public after the District Court opinions.</u>[9]

---

[9] As a general rule, a FOIA decision is evaluated as of the time it was made and not at the time of a court's review. <u>See</u>, <u>e.g.</u>, <u>Bonner v. U.S. Dep't of State</u>, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing."). On this basis, the Government argues that we cannot consider any official disclosures made after the District Court's opinion.

We disagree. Although we are not required to consider such evidence, the circumstances of this case support taking judicial notice of the statements here. <u>See</u> Fed. R. Evid. 201(b)(2). The Government's post-request disclosures "go[] to the heart of the contested issue," <u>Powell v. U.S. Bureau of Prisons</u>, 927 F.2d 1239, 1243 (D.C. Cir. 1991) (internal quotation marks omitted), and, as discussed below, are inconsistent with some of its prior claims, including that the Government has never acknowledged CIA's operational involvement. Taking judicial notice of such statements is the same course taken by the Court of Appeals for the D.C. Circuit in its recent <u>ACLU v. C.I.A.</u> decision. 710 F.3d at 431. We conclude that it is the most sensible approach to ongoing disclosures by the Government made in the midst of FOIA litigation.

Moreover, the Government's request for an opportunity to submit new material concerning public disclosures made after the District Court's decision was honored by affording the Government an opportunity, after oral argument, to submit such material <u>ex parte</u> for <u>in camera</u> inspection, which the Government has done.

25

After the District Court entered judgment for the Defendants, one document and several statements of Government officials that the Plaintiffs contend support their claims became publicly available.  The document is captioned "DOJ White Paper" and titled "Lawfulness of a Lethal Operation Directed Against a U.S. Citizen Who Is a Senior Operational Leader of Al-Qa'ida or an Associated Force" ("DOJ White Paper").  As the Government acknowledges, see Br. for Appellees at 25, the 16-page, single-spaced DOJ White Paper was leaked to the press and subsequently officially disclosed by DOJ.[10]  The leak occurred on February 4,

---

[10] The DOJ White Paper was leaked to Michael Isikoff, a reporter with NBC News, according to a report available at http://nbcnews.to/U1ZII3; the text of the leaked document is available via a link at that website.  (Hard copies of the documents available at this and all other websites cited in this opinion, as well as copies of videos available at websites cited in this opinion, to the extent they can be copied, have been docketed with the Clerk of Court for public reference.)  The official disclosure, acknowledged by the Government, see Br. for Appellees at 25, was made by OIP on Feb. 4, 2013, in response to an FOIA request submitted by Truthout, according to a report available at http://www.truth-out.org/news/item/14585-targeted-killing-white-paper-leaked-to-nbc-news-turned-over-to-truthout-by-doj-in-response-to-a-six-month-old-foia-request-four-days-later; the text of the officially disclosed document is available via a link at that website and also at https://www.documentcloud.org/documents/602342-draft-white-paper.html. The document disclosed to Truthout is marked "draft"; the document leaked to Isikoff is not marked "draft" and is dated November 8, 2011. The texts of the two documents are identical, except that the document

26

2013; the official disclosure occurred four days later.

The statements are those of John O. Brennan, Attorney General Eric Holder, and President Obama. Brennan, testifying before the Senate Select Committee on Intelligence on February 7, 2013, on his nomination to be director of CIA, said, among other things, "The Office of Legal Counsel advice establishes the legal boundaries within which we can operate." Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency Before the S. Select Comm. on Intelligence,

leaked to Isikoff is not dated and not marked "draft."

ACLU contends that DOJ did not release the DOJ White Paper in response to its FOIA request, nor list it on its Vaughn index. See Br. for ACLU at 21 n.7. The Government responds that ACLU had narrowed its request to exclude "draft legal analyses," Letter from Eric A.O. Ruzicka to Sarah S. Normand (Apr. 3, 2012), and that the DOJ White Paper was "part of document number 60 on the Vaughn index submitted by the Office of Legal Counsel as an attachment to a responsive e-mail. See Br. for Appellees at 25 n.8. The OLC's Vaughn index describes document number 60 as "E-mail circulating draft legal analysis regarding the application of domestic and international law to the use of lethal force in a foreign country against U.S. citizens in certain circumstances, and discussion regarding interagency deliberations concerning the same" and invokes Exemption 5. Apparently, OLC expected ACLU to understand "circulating" to mean "attachment."

The Government offers no explanation as to why the identical text of the DOJ White Paper, not marked "draft," obtained by Isikoff, was not disclosed to ACLU, nor explain the discrepancy between the description of document number 60 and the title of the DOJ White Paper.

27

113 Cong. 57 (Feb. 7, 2013) ("Brennan Hearing"), available at http://www.intelligence.senate.gov/130207/transcript.pdf. Holder sent a letter to Senator Patrick J. Leahy, Chairman of the Senate Judiciary Committee on May 22, 2013 ("Holder Letter").[11] In that letter Holder stated, "The United States . . . has specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi," Holder Letter at unnumbered second page, and acknowledged that United States counterterrorism operations had killed Samir Khan and Abdulrahman al-Awlaki, who, he states, were not targeted by the United States, see id. He also stated, "[T]he Administration has demonstrated its commitment to discussing with the Congress and the American people the circumstances in which it could lawfully use lethal force in a foreign country against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and is actively engaged in planning to kill Americans." Id. He also stated, "The decision to target Anwar al-Aulaki was lawful . . . ." Id. at fourth unnumbered page. President Obama delivered an address at the National Defense University on May

_____

[11] The Holder Letter is available at http://www.justice.gov/ag/AG-letter-5-22-13.pdf.

23, 2013.[12] In that address, the President listed al-Awlaki's terrorist activities and acknowledged that he had "authorized the strike that took him out."

## Discussion

I. FOIA Standards.

FOIA calls for "broad disclosure of Government records." CIA v. Sims, 471 U.S. 159, 166 (1985). The disclosure obligation is subject to several exemptions. However, "consistent with the Act's goal of broad disclosure, these exemptions have consistently been given a narrow compass." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (internal quotation marks omitted). Exemptions 1 (classified documents), 3 (documents protected by statute), and 5 (privileged documents), outlined above, have been invoked in this litigation. "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." Wilner, 592 F.3d at 69. To meet its burden of proof, the agency can submit "[a]ffidavits or

_____

[12] The President's address is available via a link at http://wh.gov/hrTq.

29

declarations giving reasonably detailed explanations why any withheld documents fall within an exemption." ACLU v. Dep't of Justice, 681 F.3d 61, 69 (2d Cir. 2012) (internal quotation marks omitted).

We review de novo a district court's grant of summary judgment in FOIA litigation. See Wilner, 592 F.3d at 69. When an agency claims that a document is exempt from disclosure, we review that determination and justification de novo. See id. When the claimed exemptions involve classified documents in the national security context, the Court must give "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." ACLU, 681 F.3d at 69 (emphasis in original) (internal quotation marks omitted).

II. Appellants' Claims

Narrowing the scope of the Shane request (OLC opinions that address the legal status of targeted killings) and the Savage request (OLC memoranda analyzing the circumstances under which it would be lawful to kill a United States citizen who is deemed to be a terrorist), Appellant N.Y. Times presses on appeal its

request to OLC for disclosure of the OLC-DOD memorandum. N.Y. Times also requests a <u>Vaughn</u> index of all withheld documents, instead of the no number, no list and <u>Glomar</u> responses it has received. <u>See</u> Br. for N.Y. Times at 51-52. ACLU seeks disclosure of the OLC-DOD memorandum; what it refers to as "the Unclassified Memos," Br. for ACLU at 50, 61, which are documents nos. 9 and 10 on DOD's <u>Vaughn</u> index, <u>see</u> <u>Dist. Ct. Op.</u>, 915 F. Supp. 2d at 545; and "certain OLC memoranda that the agencies have not addressed in this litigation but whose existence they have officially acknowledged in public statements," Br. for ACLU at 50. ACLU also requests <u>Vaughn</u> indices and asks that OIP be required "to renew its search for responsive documents." Br. for ACLU at 61.

III. The OLC-DOD Memorandum

The OLC-DOD Memorandum, as described by OLC, is an "OLC opinion pertaining to the Department of Defense marked classified . . .[t]hat . . . contains confidential legal advice to the Attorney General, for his use in interagency deliberations, regarding a potential military operation in a foreign country."

Bies Decl. ¶ 30.

OLC withheld the OLC-DOD Memorandum as protected from disclosure by Exemption 5 "because it is protected by the deliberative process and attorney-client privileges." Id. DOD withheld the document under Exemptions 1 and 5 "because the content of the document contains information about military operations, intelligence sources and methods, foreign government information, foreign relations, and foreign activities." Neller Decl. ¶ 17. General Neller stated that the classified information in the OLC-DOD Memorandum "is not reasonably segregable." Id.

In upholding the application of Exemption 1 to the OLC-DOD Memorandum, the District Court first ruled that the affidavits supplied by senior Government officials demonstrated that classification had been properly made. See Dist. Ct. Op., 915 F. Supp. 2d at 535. The Court then ruled that legal analysis may be classified, citing three district court opinions.[13] See id.

_____

[13] New York Times Co. v. U.S. Dep't of Justice, 872 F. Supp. 2d 309, 312-13, 317-18 (S.D.N.Y. 2012), ACLU v. Office of the Director of National Intelligence, No. 10 Civ. 4419, 2011 WL 5563520, at *8 (S.D.N.Y. Nov. 15, 2011), and Center for International Environmental

After pointing out that Exemption 1 applies to documents properly classified pursuant to an Executive Order and that Executive Order No. 13526 "applies to any information that 'pertains to' military plans or intelligence activities (including covert action), sources or methods," id., the Court stated, "I see no reason why legal analysis cannot be classified pursuant to E.O. 13526 if it pertains to matters that are themselves classified," id.

In considering the application of Exemption 5 to the OLC-DOD Memorandum, the District Court noted the Government's claim that both the deliberative process and attorney-client privileges protected the document, and observed that N.Y. Times did not disagree that the document might at one time have been withheld under both privileges. See id. at 544.

After determining that Exemptions 1 and 5 applied to the OLC-DOD Memorandum, the Court considered and rejected the Plaintiffs' claims that the Government had waived application of these exemptions. With respect to waiver of Exemption 1, the

Law v. Office of the U.S. Trade Representative, 505 F. Supp. 2d 150, 154 (D.D.C. 2007).

Court stated that waiver occurs only where the government has "officially" disclosed the information sought, Dist. Ct. Op., 915 F. Supp. 2d at 536 (citing Halpern v. FBI, 181 F.3d 279, 294 (2d Cir. 1989)), and that official disclosure of classified information occurs only if the classified information is "'as specific as the information previously released,'" "'match[es] the information previously disclosed,'" and was "'made public through an official and documented disclosure,'" id. (quoting Wilson, 586 F.3d at 186). The District Court ruled that no official disclosure had been made concerning documents containing operational details of targeted killings, sought by ACLU, see id., and that none of the public pronouncements cited by the Plaintiffs "reveals the necessary detailed legal analysis that supports the Administration's conclusion that targeted killing, whether of citizens or otherwise, is lawful," id. at 538 (footnote omitted).

With respect to waiver of Exemption 5, the District Court ruled that the deliberative process privilege had not been waived because "there is no evidence that the Government continually

34

relied upon and repeated in public the arguments made specifically in the OLC-DOD Memo," id. at 549 (emphasis in original) (internal quotation marks omitted), and that "it is sheer speculation that this particular OLC memorandum . . . contains the legal analysis that justifies the Executive Branch's conclusion that it is legal in certain circumstances to target suspected terrorists, including United States citizens, for killing away from a 'hot' field of battle," id. The Court saw no need to consider the plaintiffs' claim of waiver in the context of the attorney-client privilege because the deliberative process privilege protected the OLC-DOD Memorandum under Exemption 5. See id.

We agree with the District Court's conclusions that the OLC-DOD Memorandum was properly classified and that no waiver of any operational details in that document has occurred. With respect to the document's legal analysis, we conclude that waiver of Exemptions 1 and 5 has occurred.[14] "Voluntary disclosures of all

---

[14] We therefore need not consider the Appellants' claim that the legal analysis in the OLC-DOD Memorandum was not subject to classification.

35

or part of a document may waive an otherwise valid FOIA exemption," Dow Jones & Co. v. U.S. Dep't of Justice, 880 F. Supp. 145, 150-51 (S.D.N.Y. 1995) (citing Mobil Oil Corp. v. E.P.A., 879 F.2d 698, 700 (9th Cir. 1989)), vacated in part on other grounds, 907 F. Supp. 79 (S.D.N.Y. 1995), and the attorney-client and deliberative privileges, in the context of Exemption 5, may be lost by disclosure, see Brennan Center for Justice v. U.S. Dep't of Justice, 697 F.3d 184, 208 (2d Cir. 2012).

(a) Loss of Exemption 5. Exemption 5 "'properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" Id. at 196 (quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 153 (1975)). At the same time, we recognize that "the law extends the privilege to legal advice given by a lawyer to his client [because] statements by the lawyer often reveal – expressly or by necessary implication –  assumptions of fact based on statements by the client," George A. Davidson & William

36

H. Voth, <u>Waiver of the Attorney-Client Privilege</u>, 64 Oregon L. Rev. 637, 650 (1986).

In considering waiver of the legal analysis in the OLC-DOD Memorandum, we note initially the numerous statements of senior Government officials discussing the lawfulness of targeted killing of suspected terrorists, which the District Court characterized as "an extensive public relations campaign to convince the public that [the Administration's] conclusions [about the lawfulness of the killing of al-Awlaki] are correct." <u>Dist. Ct. Op.</u>, 915 F. Supp. 2d at 524. In a March 25, 2010, speech at the annual meeting of the American Society of International Law in Washington, D.C., then-Legal Adviser of the State Department Harold Hongju Koh said, "U.S. targeting practices, including lethal operations conducted with the use of unmanned aerial vehicles, comply with all applicable law, including the laws of war." JA 113, 124. In a February 22, 2012, speech at the Yale Law School, Jeh Johnson, then-General Counsel of DOD, "summarize[d] . . . some of the basic legal principles that form the basis for the U.S. military's counterterrorism

efforts against Al Qaeda and its associated forces," JA 399, and referring explicitly to "targeted killing," said, "In an armed conflict, lethal force against known, individual members of the enemy is a long-standing and long-legal practice," JA 402.

In a March 5, 2012, speech at Northwestern University, Attorney General Holder said, "[I]t is entirely lawful – under both United States law and applicable law of war principles – to target specific senior operational leaders of al Qaeda and associated forces." JA 449. He discussed the relevance of the Due Process Clause, id., and maintained that killing a senior al Qaeda leader would be lawful at least in circumstances where

> [f]irst, the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; second, capture is not feasible; and third, the operation would be conducted in a manner consistent with applicable law of war principles.

JA 450. Amplifying this last point, he stated that "use of lethal force by the United States will comply with the four fundamental law of war principles governing the use of force: . . . necessity[,] . . . distinction[,] . . . proportionality[,] . . . [and] humanity." Id. As the District Court noted, "The

Northwestern Speech [by the Attorney General] discussed the legal considerations that the Executive Branch takes into consideration before targeting a suspected terrorist for killing" and "the speech constitutes a sort of road map of the decision-making process that the Government goes through before deciding to 'terminate' someone 'with extreme prejudice.'" Dist. Ct. Op., 915 F. Supp. 2d at 537.

In an April 30, 2012, speech at the Wilson Center in Washington D.C., John O. Brennan, then-Assistant to the President for Homeland Security and Counterterrorism, said, "Yes, in full accordance with the law, and in order to prevent terrorist attacks on the United States and to save American lives, the United States Government conducts drone strikes against specific al-Qaida terrorists, sometimes using remotely piloted aircraft, often referred to publicly as drones." JA 95. On Feb. 7, 2013, Brennan, testifying on his nomination to be director of CIA, said, "The Office of Legal Counsel advice establishes the legal boundaries within which we can operate." Brennan Hearing at 57.

Even if these statements assuring the public of the

lawfulness of targeted killings are not themselves sufficiently detailed to establish waiver of the secrecy of the legal analysis in the OLC-DOD Memorandum, they establish the context in which the most revealing document, disclosed after the District Court's decision, should be evaluated. That document is the DOJ White Paper, officially released on Feb. 4, 2013. See note 9, above. Before considering the relevance of the DOJ White Paper to the Government's claim to continued secrecy and privilege of the legal analysis in the OLC-DOD Memorandum, we describe that Memorandum, which we have examined in camera, in some detail.

The OLC-DOD Memorandum is a 41-page classified document, dated July 16, 2010, captioned:

MEMORANDUM FOR THE ATTORNEY GENERAL

*Re: Applicability of Federal Criminal Laws and the Constitution to*
*Contemplated Lethal Operations Against Shykh Anwar al-Aulaki*[15]

It was prepared on the letterhead of OLC and signed by David J. Barron, Acting Assistant Attorney General.

The OLC-DOD Memorandum has several parts. After two

---

[15] We have deleted classification codes from the caption and throughout the document.

introductory paragraphs, Part I(A) reports intelligence that OLC has received concerning the relationship between Al-Qaida in the Arabian Peninsula ("AQAP") and al-Qaida, the organization and operation of AQAP, and the role al-Awlaki performs with AQAP. Parts I(B) and I(C) describe the manner in which government agencies would perform the targeted killing of al-Awlaki. Part II(A) considers Title 18 U.S.C. § 1119 (2013), entitled "Foreign murder of United States nationals" and explains why section 1119 does not proscribe killings covered by a traditionally recognized justification. Part II(B) explains why section 1119 incorporates one such justification, the public authority justification. Part III(A) explains why the public authority justification encompasses DOD's role in the contemplated targeted killing, and Part III(B) explains why that justification encompasses another agency's role in the killing. Part IV explains why the contemplated killing would not violate 18 U.S.C. § 956(a) (2013), entitled "Conspiracy to kill, maim, or injure persons or damage property in a foreign country." Part V explains why the contemplated killing would not violate 18 U.S.C. § 2441 (2013),

41

entitled "War crimes."  Part VI explains why the contemplated killing would not violate the Fourth or Fifth Amendments of the Constitution.

The 16-page, single-spaced DOJ White Paper virtually parallels the OLC-DOD Memorandum in its analysis of the lawfulness of targeted killings.  Like the Memorandum, the DOJ White Paper explains why targeted killings do not violate 18 U.S.C. §§ 1119 or 2441, or the Fourth and Fifth Amendments to the Constitution, and includes an analysis of why section 1119 encompasses the public authority justification.  Even though the DOJ White Paper does not discuss 18 U.S.C. § 956(a), which the OLC-DOD Memorandum considers, the substantial overlap in the legal analyses in the two documents fully establishes that the Government may no longer validly claim that the legal analysis in the Memorandum is a secret.  After the District Court's decision, Attorney General Holder publicly acknowledged the close relationship between the DOJ White Paper and previous OLC advice on March 6, 2013, when he said at a hearing of the Senate Committee on the Judiciary that the DOJ White Paper's discussion

42

of imminence of threatened action would be "more clear if it is read in conjunction with the underlying OLC advice."[16] Oversight of the U.S. Department of Justice Before the Senate Committee on the Judiciary, 113th Cong. (Mar. 6, 2013).

After senior Government officials have assured the public that targeted killings are "lawful" and that OLC advice "establishes the legal boundaries within which we can operate," and the Government makes public a detailed analysis of nearly all the legal reasoning contained in the OLC-DOD Memorandum, waiver of secrecy and privilege as to the legal analysis in the Memorandum has occurred.

The recent opinion of the District Court for the Northern District of California, First Amendment Coalition v. U.S. Dep't of Justice, No. 4:12-cv-01013-CW (N.D. Cal. April 11, 2014), denying an FOIA request for the OLC-DOD Memorandum, is readily distinguishable because the Court, being under the impression that "there has been no 'official disclosure' of the White Paper," id., slip op. at 24, did not assess its significance,

---

[16] The statement was made in a response to a question from Senator Mike Lee. A webcast of the hearing is available via a link at http://www.judiciary.senate.gov/hearings/hearing.cfm?id=e0c4315749c10b084028087a4aa80a73, at 1:51:30.

whereas in our case, the Government has conceded that the White Paper, with its detailed analysis of legal reasoning, has in fact been officially disclosed, see footnote 10, supra.

In resisting disclosure of the OLC-DOD Memorandum, the Government contends that making public the legal reasoning in the document will inhibit agencies throughout the Government from seeking OLC's legal advice. The argument proves too much. If this contention were upheld, waiver of privileges protecting legal advice could never occur. In La Raza, we explained that "[l]ike the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy." 411 F.3d at 360. Here, the Government has done so by publicly asserting that OLC advice "establishes the legal boundaries within which we can operate"; it "cannot invoke that relied-upon authority and then shield it from public view." Brennan Center, 697 F.3d at 207-08. Agencies seeking OLC legal advice are surely sophisticated enough to know that in these circumstances attorney/client and deliberative process privileges can be waived and the advice publicly disclosed. We need not fear that OLC

44

will lack for clients.

The Government also argues that because the OLC-DOD Memorandum refers to earlier OLC documents that remain classified, those assessing the legal reasoning in the OLC-DOD Memorandum might find the reasoning deficient without an opportunity to see the previous documents. However, the reasoning in the OLC-DOD Memorandum is rather elaborate, and readers should have no difficulty assessing the reasoning on its own terms. Moreover, the Government had no similar concern when it released the DOJ White Paper, the reasoning of which cannot be properly assessed, on the Government's argument, without seeing the OLC-DOD Memorandum. Finally, the Government always has the option of disclosing redacted versions of previous OLC advice.

The loss of protection for the legal analysis in the OLC-DOD Memorandum does not mean, however, that the entire document must be disclosed. FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under

45

this subsection." 5 U.S.C. § 552b.  The Government's waiver applies only to the portions of the OLC-DOD Memorandum that explain legal reasoning.  These are Parts II, III, IV, V, and VI of the document, and only these portions will be disclosed.  Even within those portions of the document, there are matters that the Government contends should remain secret for reasons set forth in the Government's classified ex parte submission, which we have reviewed in camera.

One of those reasons concerns [redacted] the Government persuasively argues warrants continued secrecy. [redacted]  We will redact all references to that [redacted].[17]

Two arguments concern facts mentioned within the legal reasoning portions of the OLC-DOD Memorandum that no longer merit secrecy.  One is the identity of the country in which al-Awlaki was killed.  However, numerous statements by senior Government officials identify that country as Yemen.  On September 30, 2011, DOD released a transcript reporting then-Secretary of Defense Panetta stating, "[W]e've been working with the Yemenis over a

_____

[17] The redactions made in this paragraph implement section 2(a) of our order of May 28, 2014.

long period of time to be able to target Awlaki, and I want to congratulate them on their efforts, their intelligence assistance, their operational assistance to get the job done." JA 799. On October 25, 2011, President Obama, appearing on a network television program, said, referring to al-Awlaki, "[I]t was important that, working with the [Yemenis,][18] we were able to remove him from the field." Transcript of "The Tonight Show with Jay Leno (Oct. 25, 2011). JA 556. On the day al-Awlaki was killed, September 3, 2011, DOD's Armed Forces Press Service reported, "A U.S. airstrike that killed Yemeni-based terrorist Anwar al-Awlaki early this morning is a testament to the close cooperation between the United States and Yemen, Defense Secretary Leon E. Panetta said today." JA 651. The report continued, "Obama and Panetta congratulated the Yemenis on their intelligence and operational assistance in targeting [al-] Awlaki." Id. It is no secret that al-Awlaki was killed in Yemen. However, the OLC-DOD Memorandum contains some references to the Yemeni government that are entitled to secrecy and will be

---

[18] The Tonight Show transcript erroneously rendered this word "enemies," an error the Government acknowledged at oral argument.

47

redacted.

The other fact within the legal reasoning portion of the OLC-DOD Memorandum that the Government contends merits secrecy is the identity of the agency, in addition to DOD, that had an operational role in the drone strike that killed al-Awlaki. Both facts were deleted from the April 21 public opinion, but have been restored in this opinion. Apparently not disputing that this fact has been common knowledge for some time, the Government asserts the importance of concealing any official recognition of the agency's identity. The argument comes too late.

A March 18, 2010, Wall Street Journal article quotes Panetta, then CIA Director:

> "Anytime we get a high value target that is in the top leadership of al Qaeda, it seriously disrupts their operations," Mr. Panetta said. "It sent two important signals," Mr. Panetta said. "No. 1 that we are not going to hesitate to go after them wherever they try to hide, and No. 2 that we are continuing to target their leadership."

"Drone Kills Suspect in CIA Suicide Bombing," The Wall Street Journal (Mar. 18, 2010). Although the reference to "we" is not unequivocally to CIA and might arguably be taken as a reference to the Government generally, any doubt on this score was eliminated three months later.

48

In a June 27, 2010, interview with Jake Tapper of ABC News, Panetta said:

> [W]e are engaged in the most aggressive operations in the history of the CIA in that part of the world, and the result is that we are disrupting their leadership. We've taken down more than half of their Taliban leadership, of their Al Qaida leadership. We just took down number three in their leadership a few weeks ago.
>
> . . .
>
> Awlaki is a terrorist and yes, he's a United States citizen, but he is first and foremost a terrorist and we're going to treat him like a terrorist. We don't have an assassination list, but I can tell you this. We have a terrorist list and he's on it.

Tr. of This Week telecast, available at http://abcnews.go.com/ThisWeek/week-transcript-panetta/story?id=11025299&singlePage=true.

On October 7, 2011, Panetta, then Secretary of Defense, was quoted as saying in a speech to sailors and Marines at the United States Navy's 6th Fleet headquarters in Naples, "Having moved from the CIA to the Pentagon, obviously I have a hell of a lot more weapons available to me in this job than I had at the CIA, although the Predators aren't bad." "U.S.: Defense secretary refers to CIA drone use," Los Angeles Times (Oct. 7, 2011).

On January 29, 2012, the following occurred when Secretary of Defense Panetta was interviewed by Scott Pelley on the CBS

49

television program "60 Minutes":

Asked, "You killed al-Awlaki?" Panetta "nodded affirmatively," as described by the District Court, see Dist. Ct. Op., 915 F. Supp. 2d at 530. Then, when asked about identifying for killing a person who has been identified as an enemy combatant, Panetta says, "It's a recommendation we make, it's a recommendation the CIA director makes in my prior role . . . the President of the United States has to sign off." Web Extra presentation, available at http://www.cbsnews.com/video/watch/?id=7396830n, at 0:01, 2:30. CIA's former director has publicly acknowledged CIA's role in the killing of al-Awlaki.

On February 7, 2014, Rep. Mike Rogers, chairman of the House Select Committee on Intelligence, disclosed that his committee has overseen the CIA's targeted-killing strikes since "even before they conducted that first air strike that took Awlaki." Transcript, *Face the Nation*, CBS News (Feb. 10, 2013), http://cbsn.ws/ZgB9R.

On February 11, 2014, the following exchange occurred between Senator Bill Nelson and James R. Clapper, Director of National Intelligence, at a hearing of the Senate Armed Services Committee:

Senator NELSON. It is – you tell me if this is correct – the administration's policy that they are exploring shifting the use of drones, unmanned aerial vehicle strikes, from the CIA to the DOD. Is that an accurate statement?

Mr. CLAPPER. Yes, sir. it is.

*Testimony on Current and Future Worldwide Threats to the National Security of the United States*, *Hearing Before the Senate Armed Services Comm.*, 113th Cong. 37 (2014), available at http://www.armed-services.senate.gov/imo/media/doc.14-07%20-%202-11-14.pdf. It is no secret that CIA has a role in the use of drones.

(b) Loss of Exemption 1. Much of the above discussion concerning loss of Exemption 5 is applicable to loss of Exemption 1. As the District of Columbia Circuit has noted, "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" Wolf v. CIA, 473 F.3d 370, 374-75 (D.C. Cir. 2007) (quoting Gardels v. CIA, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). But Gardels made it clear that the justification must be "logical" and "plausible" "in protecting our intelligence sources and methods from foreign discovery." 689 F.2d at 1105.

51

The District Court noted the Government's contention that "'[i]t is entirely logical and plausible that the legal opinion contains information pertaining to military plans, intelligence activities, sources and methods, and foreign relations.' (Gov't Memo. in Opp'n/Reply 6)." Dist. Ct. Op., 915 F. Supp. 2d at 540. But the Court then astutely observed, "[T]hat begs the question. In fact, legal analysis is not an 'intelligence source or method.'" Id.

We recognize that in some circumstances the very fact that legal analysis was given concerning a planned operation would risk disclosure of the likelihood of that operation, but that is not the situation here where drone strikes and targeted killings have been publicly acknowledged at the highest levels of the Government. We also recognize that in some circumstances legal analysis could be so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts. Aware of that possibility, we have redacted, as explained above, the entire section of the OLC-DOD Memorandum that includes any mention of intelligence gathering activities. The only other

facts mentioned in the pure legal analysis portions of the OLC-DOD Memorandum – the identification of the country where the drone strike occurred and CIA's role – have both already been disclosed, also as explained above. With respect to disclosure of CIA's role, we can be confident that neither Senator Dianne Feinstein, Chairman of the Senate Select Committee on Intelligence, nor Representative Mike Rogers, Chairman of the House Select Committee on Intelligence, thought they were revealing a secret when they publicly discussed CIA's role in targeted killings by drone strikes.[19]

The three-part test for "official" disclosure, relevant to

---

[19] Although "the law will not infer official disclosure of information classified by the CIA from . . . release of information by another agency, or even by Congress," Wilson, 586 F.3d at 186-87, these members of Congress have made public statements on this matter. Senator Feinstein has praised CIA for conducting drone strikes with less collateral damage than strikes conducted by the military. See "Senator Dianne Feinstein on Drones, Assault Weapons Ban," The Takeaway (Mar. 20, 2013), available at http:www.thetakeaway.org/story/276926-sen-dianne-feinstein-drones-assault-weapons-ban/, at 2:00. Representative Rogers told CBS that his committee has overseen CIA's targeted killing strikes "even before they conducted that first strike that took [al-]Awlaki." Transcript, Face the Nation, CBS News (Feb. 10, 2013), available at http://www.cbsnews.com/news/face-the-nation-transcripts-february-10-2013-graham-reed-and-rogers/4/.

Exemption 1, which the District Court took from <u>Wilson</u>, 586 F.3d at 536, has been sufficiently satisfied.  The legal analysis in the OLC-DOD Memorandum is "'as specific as the information previously released'" in the DOJ White Paper, it "'match[es] the information previously disclosed,'" and was "'made public through an official and documented disclosure.'" <u>Dist. Ct. Op.</u>, 915 F.3d at 536 (quoting <u>Wilson</u>, 586 F.3d at 186).  In reaching this conclusion, we do not understand the "matching" aspect of the <u>Wilson</u> test to require absolute identity.  Indeed, such a requirement would make little sense.  A FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed.[20]

---

[20] Although we conclude that the three-part test of Wilson has been satisfied, and Wilson remains the law of this Circuit, we note that a rigid application of it may not be warranted in view of its questionable provenance.  <u>Wilson</u> took the test from <u>Wolf v. CIA</u>, 473 F.3d 370, 378 (D.C. Cir. 2007), which took the test from <u>Fitzgibbon v. CIA</u>, 911 F.2d 755, 765 (D.C. Cir. 1990).  <u>Fitzgibbon</u> purported to find the test in <u>Afshar v. Dep't of State</u>, 702 F.2d 1125, 1133 (D.C. Cir. 1983).  The issue in <u>Afshar</u> was whether several books submitted to CIA for clearance contained official disclosure of details of CIA's relationship with SAVAK, Iran's intelligence service prior to 1979 and the existence of a CIA station in Tehran prior to 1979.  <u>Afshar</u> rejected the claim of official disclosure for three reasons: (1) none of the books revealed a continuing relationship between CIA and SAVAK after 1963, the date of the earliest withheld document; (2) the books provided only a general outline of such a relationship; and (3) none

With the redactions and public disclosures discussed above, it is no longer either "logical" or "plausible" to maintain that disclosure of the legal analysis in the OLC-DOD Memorandum risks disclosing any aspect of "military plans, intelligence activities, sources and methods, and foreign relations." The release of the DOJ White Paper, discussing why the targeted killing of al-Awlaki would not violate several statutes, makes this clear. The additional discussion of 18 U.S.C. § 956(a) in the OLC-DOD Memorandum adds nothing to the risk. Whatever

---

of the books was an official and documented disclosure. The second reason was supported by a citation to Lamont v. Dep't of Justice, 475 F. Supp. 761, 772 (S.D.N.Y. 1979), with a parenthetical stating that the withheld information must have "already been specifically revealed to the public" (emphasis in Afshar). Lamont did not assert specific revelation as a requirement for disclosure; it observed that the plaintiff had raised a factual issue as to whether the information sought had been specifically revealed. More important, Afshar, the ultimate source of the three-part test, does not mention a requirement that the information sought "match[es] the information previously disclosed."

Wilson also cited Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy, 891 F.2d 414 (2d Cir. 1989). Clearwater also cited Fitzgibbon and Afshar and drew from those opinions more rigidity than was warranted. The issue in Clearwater was simply whether the Navy had previously disclosed, as the plaintiff claimed, that it was planning to deploy nuclear weapons at the New York Harbor Homeport. The Court rejected the claim, pointing out that the Navy had said only that the ships to be stationed at the Homeport were capable of carrying nuclear weapons. See id. at 421.

protection the legal analysis might once have had has been lost by virtue of public statements of public officials at the highest levels and official disclosure of the DOJ White Paper.

## IV. Legal Analysis in Other Withheld Documents[21]

In addition to seeking at least the legal analysis in the OLC-DOD Memorandum, ACLU also seeks disclosure of the legal analysis in documents numbered 9 and 10 on DOD's unclassified Vaughn index and in other OLC legal memoranda the existence of which ACLU contends have been officially acknowledged in public statements. See Br. for ACLU at 50. ACLU contends that Senator Feinstein said at the confirmation hearing of Brennan to be CIA director that there are eleven such memoranda, see id. at 50 n.25, of which four were provided to the Senate Select Committee on Intelligence, see id. at 24 & n.9.

---

[21] Other than the legal analysis in the documents considered in this section, it is unclear whether the Appellants are seeking on appeal any other withheld documents. See, e.g., Br. for ACLU at 50 ("Plaintiffs do not challenge the bulk of those withholdings."). In any event, except as to the OLC-DOD Memorandum discussed in Section III, above, the documents discussed in this Section IV, and the indices discussed in Section V, below, on the current record, we affirm the District Court's decision to withhold all other documents sought. After the Government submits its classified Vaughn indices on remand, the District Court may, as appropriate, order the release of any documents that are not properly withheld.

Documents numbered 9 and 10 are DOD legal memoranda, which were made available to this Court ex parte for in camera inspection.  As to these documents, we agree with the District Court that the declaration of Richard C. Gross, Brigadier General, United States Army, JA 863, adequately supports the application of Exemption 5. See Dist. Ct. Supp. Op., 2013 WL 238928, at *1.  As General Gross pointed out, these brief documents (two and four pages respectively) are informal and predecisional.  One does not even identify the sender or the receiver.  They mention legal authorities, but in no way resemble the detailed, polished legal analysis in the disclosed DOJ White Paper.  At most, they are "part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy." Public Citizen, Inc. v. Office of Management and Budget, 598 F.3d 865, 875 (D.C. Cir. 2010) (alteration in original) (internal quotation marks omitted). See also Judicial Watch, Inc. v. FDA, 449 F.3d 141, 151 (D.C. Cir. 2006) (protecting as deliberative "the give-and-take of the consultative process") (internal quotation marks omitted).  No waiver of Exemption 5 has occurred with respect to these two documents.

The other OLC legal memoranda have not been submitted to this Court for in camera inspection, and we are therefore unable to adjudicate the waiver issue as to these memoranda, nor determine, if waiver has occurred, what portions of these documents must be redacted. It is possible that waiver of any claimed privileges applies to the legal reasoning in these documents for the same reasons applicable to the OLC-DOD Memorandum. On remand, these memoranda must be produced to the District Court for in camera examination and determination of waiver and appropriate redaction, in light of our rulings with respect to disclosure and redaction of the legal reasoning in the OLC-DOD Memorandum.

## V. Glomar and No Number, No List Responses

As set forth above, OLC, DOD, and CIA submitted either Glomar or no number, no list responses to the N.Y. Times and ACLU requests, in addition to Vaughn indices. For clarification, we set forth in the margin a chart showing the revised responses of the three agencies.[22] An agency may withhold information on the

---

[22]

| OLC: | DOD: | CIA: |
| --- | --- | --- |

number of responsive documents and a description of their contents if those facts are protected from disclosure by a FOIA exemption.  See Wilner, 592 F.3d at 67-69; Hayden v. National Security Agency, 608 F.2d 1381, 1384 (D.C. Cir. 1979).  However, we agree with the D.C. Circuit that "[s]uch a response would only be justified in unusual circumstances, and only by a particularly persuasive affidavit." ACLU, 710 F.3d at 433.

The Government's core argument to justify the Glomar and no number, no list responses, as it was with the effort to withhold the OLC-DOD Memorandum, is that identification of any document that provides legal advice to one or more agencies on the legality of targeted killings "would tend to disclose the identity of the agency or agencies that use targeted lethal force against certain terrorists who are U.S. citizens . . . ." Br. for Appellees at 37.  If one of those agencies is CIA, the Government's argument continues, disclosure of any information

| Glomar to NYTimes; no number, no list to ACLU as to classified documents, except OLC-DOD Memorandum | no number, no list to Shane, Glomar to Savage, except OLC-DOD Memorandum; no number, no list to ACLU as to classified documents, except OLC-DOD Memorandum | Glomar to NYTimes; no number, no list to ACLU |

in a <u>Vaughn</u> index that "would tend to disclose the identity" of that agency must be protected because, the Government claims, "[T]he government has never disclosed (with the exception of the Bin Laden operation) whether the CIA has an operational role in the use of targeted lethal force or is authorized to use such force." <u>Id.</u> at 38.

As was true of waiver of privileges that might originally have protected the legal reasoning in the OLC-DOD Memorandum, the statements of Panetta when he was Director of CIA and later Secretary of Defense, set forth above, have already publicly identified CIA as an agency that had an operational role in targeted drone killings.[23] With CIA identified, the Appellees' main argument for the use of Glomar and no number, no list responses evaporates. The <u>Vaughn</u> index submitted by OLC <u>in camera</u> must be disclosed, and DOD and CIA must submit classified <u>Vaughn</u> indices to the District Court on remand for <u>in camera</u> inspection and determination of appropriate disclosure and appropriate redaction.

As was also true of the OLC-DOD Memorandum, however, the requirement of disclosing the agencies' <u>Vaughn</u> indices does not

_____

[23] For purposes of the issues on this appeal, it makes no difference whether the drones were maneuvered by CIA or DOD personnel so long as CIA has been disclosed as having some operational role in the drone strikes.

necessarily mean that either the number or the listing of all documents on those indices must be disclosed. The Appellees argue persuasively that with respect to documents concerning a contemplated military operation, disclosure of the number of such documents must remain secret because a large number might alert the enemy to the need to increase efforts to defend against attacks or to avoid detection and a small number might encourage a lessening of such efforts. Accordingly, all listings after number 271 on OLC's Vaughn index will remain secret. See Wilner, 592 F.3d at 70 (upholding Glomar response as to identification of documents that would reveal "details of [a] program's operations and scope"). The descriptions of listing numbers 1-4, 6, 69, 72, 80-82, 87, 92, 103-04, 244-49, and 256 reveal information entitled to be protected. Listing numbers 10-49, 51-56, 84-86, 94, 101, 106-09, 111-12, 114-15, 251, 255, 257-61, and 266-67 describe email chains (or copies of chains). Because the Plaintiffs informed the District Court that they were not seeking these items, see Dist. Ct. Op., 915 F. Supp. 2d at 545, these listings need not be disclosed.

No reason appears why the number, title, or description of the remaining listed documents needs to be kept secret. Listing number 5 is the OLC-DOD Memorandum; listing numbers 7-9, 50, 250, 262-65, and 269-71 describe documents and attorney notes

61

concerning legal advice; listing numbers 57-68, 70-71, 73-79, 83, 88-91, 93, 95-100, 102, 105, 110, 113, 116-22, and 144-45 are described as including factual information concerning al-Awlaki; listing numbers 123-30 are described as unclassified open source materials; listing numbers 131-43 and 148-237 are described as drafts of the OLC-DOD Memorandum; listing numbers 238-43 are described as drafts of other documents; listing numbers 146-47 are described as drafts of Document 86A, a listing that does not appear on the OLC's Vaughn index; and listing numbers 244, 246, 248, 252-54, 256, and 268 are described as including [redacted][24].

Some, perhaps all, of the information in many of these documents might be protected as classified intelligence information or predecisional. If the Plaintiffs challenge the applicability of a cited exemption, the District Court, after in camera inspection, will be able to determine which of these documents need to be withheld and which portions of these documents need to be redacted as subject to one or more exemptions that have not been waived. At this stage, we decide only that the number, title, and description of all documents listed on OLC's classified Vaughn index must be disclosed, with the exception of listing numbers 1-4, 6, 69, 72, 80-82, 87, 92,

---

[24] This redaction implements section 2(a) of our order of May 28, 2014.

103-04, 244-49; 10-49, 51-56, 84-86, 94, 101, 106-09, 111-12, 114-15, 251, 252-54, 255-61, 266-67, 268; and all listings after listing number 271.

Unlike OLC, DOD and CIA did not provide this Court with classified Vaughn indices, and we are unable to distinguish among listed document numbers, which titles or descriptions merit secrecy. We will therefore direct that, upon remand, DOD and CIA will provide the District Court with classified Vaughn indices listing documents responsive to the Plaintiffs' requests. From these indices, the District Court, with the guidance provided by this opinion, should have little difficulty, after examining whatever further affidavits DOD and CIA care to submit to claim protection of specific listings, to determine which listings on these indices may be disclosed. See ACLU, 710 F.3d at 432 (prescribing a similar procedure after rejecting a Glomar response).

VI. Adequacy of OIP's Search

Finally, ACLU argues that OIP did not make an adequate search because it did not disclose thirty e-mail chains with other DOJ offices that were found during OLC's search for responsive records. See Br. for ACLU at 60. However, as this Court has recognized, a search is not inadequate merely because

it does not identify all responsive records. See Grand Central Partnership, Inc. v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999). The adequacy of a search is not measured by its results, but rather by its method. See Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). To show that a search is adequate, the agency affidavit "must be relatively detailed and nonconclusory, and submitted in good faith." Grand Central Partnership, 166 F.3d at 489 (internal quotation marks omitted). The affidavit submitted by an OIP official, JA 412-419 ¶¶ 7-34, easily meets these requirements, and the November 3, 2011, cut-off date was reasonable as the date on which the search was commenced. See Edmonds Institute v. U.S. Dep't of Interior, 383 F. Supp. 2d 105, 110-11 (D.D.C. 2005).

## Conclusion

For the reasons stated above, we conclude that:

(1) a redacted version of the OLC-DOD Memorandum (attached as Appendix A to this opinion) must be disclosed;

(2) a redacted version of the classified Vaughn index submitted by OLC must be disclosed, including

64

the number, title, and description of all documents, with the exception of listing numbers 1-4, 6, 10-49, 51-56, 69, 72, 80-82, 84-87, 92, 94, 101, 103-04, 106-09, 111-12, 114-15, 244-49, 251, 252-54, 255-61, 266-67, 268; and all listings after listing number 271;

(3) other legal memoranda prepared by OLC and at issue here must be submitted to the District Court for in camera inspection and determination of waiver of privileges and appropriate redaction;

(4) the Glomar and "no number, no list" responses are insufficiently justified;

(5) DOD and CIA must submit Vaughn indices to the District Court for in camera inspection and determination of appropriate disclosure and appropriate redaction; and

(6) the OIP search was sufficient.

We therefore affirm in part, reverse in part, and remand.[25]

Appendix A

---

[25] Prior to filing, we have made this opinion available to the Government in camera to afford an opportunity to advise whether any classified information, not intended to be disclosed by this opinion, has been inadvertently disclosed.

OLC-DOD Memorandum after appropriate redactions and deletion of classification codes (redactions in the OLC-DOD Memorandum are indicated by white spaces)



U.S. Department of Justice

Office of Legal Counsel

Office of the Assistant Attorney General        *Washington, D.C. 20530*

July 16, 2010

## MEMORANDUM FOR THE ATTORNEY GENERAL

*Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi*

## II.

We begin our legal analysis with a consideration of section 1119 of title 18, entitled "Foreign murder of United States nationals." Subsection 1119(b) provides that "[a] person who, being a national of the United States, kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113." 18 U.S.C. § 1119(b).[6] In light of the nature of the contemplated operations described above, and the fact that their target would be a "national of the United States" who is outside the United States, we must examine whether section 1119(b) would prohibit those operations. We first explain, in this part, the scope of section 1119 and why it must be construed to incorporate the public authority justification, which can render lethal action carried out by a governmental official lawful in some circumstances. We next explain in part III-A why that public authority justification would apply to the contemplated DoD operation. Finally, we explain in part III-B why that justification would apply to the contemplated CIA operation. As to each agency, we focus on the particular circumstances in which it would carry out the operation.

### A.

Although section 1119(b) refers only to the "punish[ments]" provided under sections 1111, 1112, and 1113, courts have construed section 1119(b) to incorporate the substantive elements of those cross-referenced provisions of title 18. *See, e.g.*, *United States v. Wharton*, 320 F.3d 526, 533 (5th Cir. 2003); *United States v. White*, 51 F. Supp. 2d 1008, 1013-14 (E.D. Ca. 1997). Section 1111 of title 18 sets forth criminal penalties for "murder," and provides that "[m]urder is the unlawful killing of a human being with malice aforethought." *Id.* § 1111(a). Section 1112 similarly provides criminal sanctions for "manslaughter," and states that "[m]anslaughter is the unlawful killing of a human being without malice." *Id.* § 1112. Section 1113 provides criminal penalties for "attempts to commit murder or manslaughter." *Id.* § 1113. It is therefore clear that section 1119(b) bars only "unlawful killings."[7]

---

[6] *See also* 18 U.S.C. § 1119(a) (providing that "national of the United States" has the meaning stated in section 101(a)(22) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22)).

[7] Section 1119 itself also expressly imposes various procedural limitations on prosecution. Subsection 1119(c)(1) requires that any prosecution be authorized in writing by the Attorney General, the Deputy Attorney General, or an Assistant Attorney General, and precludes the approval of such an action "if prosecution has been previously undertaken by a foreign country for the same conduct." In addition, subsection 1119(c)(2) provides that

This limitation on section 1119(b)'s scope is significant, as the legislative history to the underlying offenses that the section incorporates makes clear. The provisions section 1119(b) incorporates derive from sections 273 and 274 of the Act of March 4, 1909, ch. 321, 35 Stat. 1088, 1143. The 1909 Act codified and amended the penal laws of the United States. Section 273 of the enactment defined murder as "the unlawful killing of a human being with malice aforethought," and section 274 defined manslaughter as "the unlawful killing of a human being without malice." 35 Stat. 1143.[8] In 1948, Congress codified the federal murder and manslaughter provisions at sections 1111 and 1112 of title 18 and retained the definitions of murder and manslaughter in nearly identical form, see Act of June 25, 1948, ch. 645, 62 Stat. 683, 756, including the references to "unlawful killing" that remain in the statutes today—references that track similar formulations in some state murder statutes.[9]

---

"[n]o prosecution shall be approved under this section unless the Attorney General, in consultation with the Secretary of State, determines that the conduct took place in a country in which the person is no longer present, and the country lacks the ability to lawfully secure the person's return"—a determination that "is not subject to judicial review," id.

[8] A 1908 joint congressional committee report on the Act explained that "[u]nder existing law [i.e., prior to the 1909 Act], there [had been] no statutory definition of the crimes of murder or manslaughter." Report by the Special Joint Comm. on the Revision of the Laws, Revision and Codification of the Laws, Etc., H.R. Rep. No. 2, 60th Cong. 1st Sess., at 12 (Jan. 6, 1908) ("Joint Committee Report"). We note, however, that the 1878 edition of the Revised Statutes did contain a definition for manslaughter (but not murder): "Every person who, within any of the places or upon any of the waters [within the exclusive jurisdiction of the United States] unlawfully and willfully, but without malice, strikes, stabs, wounds, or shoots at, otherwise injures another, of which striking, stabbing, wounding, shooting, or other injury such other person dies, either on land or sea, within or without the United States, is guilty of the crime of manslaughter." Revised Statutes § 5341 (1878 ed.) (quoted in United States v. Alexander, 471 F.2d 923, 944-45 n.54 (D.C. Cir. 1972)). With respect to murder, the 1908 report noted that the legislation "enlarges the common-law definition, and is similar in terms to the statutes defining murder in a large majority of the States." Joint Committee Report at 24; see also Revision of the Penal Laws: Hearings on S. 2982 Before the Senate as a Whole, 60th Cong., 1st Sess. 1184, 1185 (1908) (statement of Senator Heyburn) (same). With respect to manslaughter, the report stated that "[w]hat is said with respect to [the murder provision] is true as to this section, manslaughter being defined and classified in language similar to that to be found in the statutes of a large majority of the States." Joint Committee Report at 24.

[9] See, e.g., Cal. Penal Code § 187(a) (West 2009) ("Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."); Fla. Stat. § 782.04(1)(a) (West 2009) (including "unlawful killing of a human being" as an element of murder); Idaho Code Ann. § 18-4001 (West 2009) ("Murder is the unlawful killing of a human being"); Nev. Rev. Stat. Ann. § 200.010 (West 2008) (including "unlawful killing of a human being" as an element of murder); R. I. Gen. Laws § 11-23-1 (West 2008) ("The unlawful killing of a human being with malice aforethought is murder."); Tenn. Code Ann. § 39-13-201 (West 2009) ("Criminal homicide is the unlawful killing of another person"). Such statutes, in turn, reflect the view often expressed in the common law of murder that the crime requires an "unlawful" killing. See, e.g., Edward Coke, The Third Part of the Institutes of Laws of England 47 (London, W. Clarke & Sons 1809) ("Murder is when a man of sound memory, and of the age of discretion, unlawfully killeth within any county of the realm any reasonable creature in rerum natura under the king's peace, with malice fore-thought, either expressed by the party, or implied by law, so as the party wounded, or hurt, &c. die of the wound, or hurt, &c. within a year and a day after the same."); 4 William Blackstone, Commentaries on the Laws of England 195 (Oxford 1769) (same); see also A Digest of Opinions of the Judge Advocates General of the Army 1074 n.3 (1912) ("Murder, at common law, is the unlawful killing by a person of sound memory and discretion, of any reasonable creature in being and under the peace of the State, which malice aforethought either express or implied.") (internal quotation marks omitted).

13

As this legislative history indicates, guidance as to the meaning of what constitutes an "unlawful killing" in sections 1111 and 1112—and thus for purposes of section 1119(b)—can be found in the historical understandings of murder and manslaughter. That history shows that states have long recognized justifications and excuses to statutes criminalizing "unlawful" killings.[10] One state court, for example, in construing that state's murder statute explained that "the word 'unlawful' is a term of art" that "connotes a homicide with the absence of factors of excuse or justification," *People v. Frye*, 10 Cal. Rptr. 2d 217, 221 (Cal. App. 1992). That court further explained that the factors of excuse or justification in question include those that have traditionally been recognized, *id.* at 221 n.2. Other authorities support the same conclusion. *See, e.g., Mullaney v. Wilbur*, 421 U.S. 684, 685 (1975) (requirement of "unlawful" killing in Maine murder statute meant that killing was "neither justifiable nor excusable"); *cf. also* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 56 (3d ed. 1982) ("Innocent homicide is of two kinds, (1) justifiable and (2) excusable.").[11] Accordingly, section 1119 does not proscribe killings covered by a justification traditionally recognized, such as under the common law or state and federal murder statutes. *See White*, 51 F. Supp. 2d at 1013 ("Congress did not intend [section 1119] to criminalize justifiable or excusable killings.").

<center>B.</center>

Here, we focus on the potential application of one such recognized justification—the justification of "public authority"—to the contemplated DoD and CIA operations. Before examining whether, on these facts, the public authority justification would apply to those operations, we first explain why section 1119(b) incorporates that particular justification.

The public authority justification, generally understood, is well-accepted, and it is clear it may be available even in cases where the particular criminal statute at issue does not expressly

---

[10] The same is true with respect to other statutes, including federal laws, that modify a prohibited act other than murder or manslaughter with the term "unlawfully." *See, e.g., Territory v. Gonzales*, 89 P. 250, 252 (N.M. Terr. 1907) (construing the term "unlawful" in statute criminalizing assault with a deadly weapon as "clearly equivalent" to "without excuse or justification"). For example, 18 U.S.C. § 2339C makes it unlawful, *inter alia*, to "unlawfully and willfully provide[] or collect[] funds" with the intention that they be used (or knowledge they are to be used) to carry out an act that is an offense within certain specified treaties, or to engage in certain other terrorist acts. The legislative history of section 2339C makes clear that "[t]he term 'unlawfully' is intended to embody common law defenses." H.R. Rep. No. 107-307, at 12 (2001). Similarly, the Uniform Code of Military Justice makes it unlawful for members of the armed forces to, "without justification or excuse, unlawfully kill[] a human being" under certain specified circumstances. 10 U.S.C. § 918. Notwithstanding that the statute already expressly requires lack of justification or excuse, it is the longstanding view of the armed forces that "[k]illing a human being is *unlawful*" for purposes of this provision "when done without justification or excuse." Manual for Courts-Martial United States (2008 ed.), at IV-63, art. 118, comment (c)(1) (emphasis added).

[11]

14

refer to a public authority justification.[12] Prosecutions where such a "public authority" justification is invoked are understandably rare, *see* American Law Institute, Model Penal Code and Commentaries § 3.03 Comment 1, at 24 (1985); *cf. VISA Fraud Investigation*, 8 Op. O.L.C. 284, 285 n.2, 286 (1984), and thus there is little case law in which courts have analyzed the scope of the justification with respect to the conduct of government officials.[13] Nonetheless, discussions in the leading treatises and in the Model Penal Code demonstrate its legitimacy. *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.2(b), at 135 (2d ed. 2003); Perkins & Boyce, *Criminal Law* at 1093 ("Deeds which otherwise would be criminal, such as taking or destroying property, taking hold of a person by force and against his will, placing him in confinement, or even taking his life, are not crimes if done with proper public authority."); *see also* Model Penal Code § 3.03(1)(a), (d), (e), at 22-23 (proposing codification of justification where conduct is "required or authorized by," inter alia, "the law defining the duties or functions of a public officer . . ."; "the law governing the armed services or the lawful conduct of war"; or "any other provision of law imposing a public duty"); National Comm'n on Reform of Federal Criminal Laws, A Proposed New Federal Criminal Code § 602(1) ("Conduct engaged in by a public servant in the course of his official duties is justified when it is required or authorized by law."). And this Office has invoked analogous rationales in several instances in which it has analyzed whether Congress intended a particular criminal statute to prohibit specific conduct that otherwise falls within a government agency's authorities.[14]

---

[12] Where a federal criminal statute incorporates the public authority justification, and the government conduct at issue is within the scope of that justification, there is no need to examine whether the criminal prohibition has been repealed, impliedly or otherwise, by some other statute that might potentially authorize the governmental conduct, including by the authorizing statute that might supply the predicate for the assertion of the public authority justification itself. Rather, in such cases, the criminal prohibition simply does not apply to the particular governmental conduct at issue in the first instance because Congress intended that prohibition to be qualified by the public authority justification that it incorporates. Conversely, where another statute expressly authorizes the government to engage in the *specific* conduct in question, then there would be no need to invoke the more general public authority justification doctrine, because in such a case the legislature itself has, in effect, carved out a specific exception permitting the executive to do what the legislature has otherwise generally forbidden. We do not address such a circumstance in this opinion.

[13] The question of a "public authority" justification is much more frequently litigated in cases where a private party charged with a crime interposes the defense that he relied upon authority that a public official allegedly conferred upon him to engage in the challenged conduct. *See generally* United States Attorneys' Manual tit. 9, Criminal Resource Manual § 2055 (describing and discussing three different such defenses of "governmental authority"); National Comm'n on Reform of Federal Criminal Laws, A Proposed New Federal Criminal Code § 602(2); Model Penal Code § 3.03(3)(b); *see also United States v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001); *United States v. Rosenthal*, 793 F.2d 1214, 1235-36 (11th Cir. 1986); *United States v. Duggan*, 743 F.2d 59, 83-84 (2d Cir. 1984); Fed. R. Crim. P. 12.3 (requiring defendant to notify government if he intends to invoke such a public authority defense). We do not address such cases in this memorandum, in which our discussion of the "public authority" justification is limited to the question of whether a particular criminal law applies to specific conduct undertaken by *government agencies* pursuant to their authorities.

[14] *See, e.g.,* Memorandum for

The public authority justification does not excuse all conduct of public officials from all criminal prohibitions. The legislature may design some criminal prohibitions to place bounds on the kinds of governmental conduct that can be authorized by the Executive. Or, the legislature may enact a criminal prohibition in order to delimit the scope of the conduct that the legislature has otherwise authorized the Executive to undertake pursuant to another statute.[15] But the recognition that a federal criminal statute may incorporate the public authority justification reflects the fact that it would not make sense to attribute to Congress the intent with respect to each of its criminal statutes to prohibit all covered activities undertaken by public officials in the legitimate exercise of their otherwise lawful authorities, even if Congress has clearly intended to make those same actions a crime when committed by persons who are not acting pursuant to such public authority. In some instances, therefore, the better view of a criminal prohibition may well be that Congress meant to distinguish those persons who are acting pursuant to public authority, at least in some circumstances, from those who are not, even if the statute by terms does not make that distinction express. Cf. Nardone v. United States, 302 U.S. 379, 384 (1937) (federal criminal statutes should be construed to exclude authorized conduct of public officers where such a reading "would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm").[16]

Here, we consider a federal murder statute, but there is no general bar to applying the public authority justification to such a criminal prohibition. For example, with respect to prohibitions on the unlawful use of deadly force, the Model Penal Code recommended that legislatures should make the public authority (or "public duty") justification available, though only where the use of such force is covered by a more particular justification (such as defense of others or the use of deadly force by law enforcement), where the use of such force "is otherwise expressly authorized by law," or where such force "occurs in the lawful conduct of war." Model Penal Code § 3.03(2)(b), at 22; see also id. Comment 3, at 26. Some states proceeded to adopt the Model Penal Code recommendation.[17] Other states, although not adopting that precise

---

see also Visa Fraud Investigation, 8 Op. O.L.C. at 287-88 (concluding that civil statute prohibiting issuance of visa to an alien known to be ineligible did not prohibit State Department from issuing such a visa where "necessary" to facilitate important Immigration and Naturalization Service undercover operation carried out in a "reasonable" fashion).

[15] See, e.g., Nardone v. United States, 302 U.S. 379, 384 (1937) (government wiretapping was proscribed by federal statute);

[16] In accord with our prior precedents, each potentially applicable statute must be carefully and separately examined to discern Congress's intent in this respect—such as whether it imposes a less qualified limitation than section 1119 imposes. See generally, e.g., United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking, 18 Op. O.L.C. 148 (1994); Application of Neutrality Act to Official Government Activities, 8 Op. O.L.C. 58 (1984).

[17] See, e.g., Neb. Rev. Stat. § 28-1408(2)(b); Pa. C.S.A. § 504(b)(2); Tex. Penal Code tit. 2, § 9.21(c).

formulation, have enacted specific statutes dealing with the question of when public officials are justified in using deadly force, which often prescribe that an officer acting in the performance of his official duties must reasonably have believed that such force was "necessary."[18] Other states have more broadly provided that the public authority defense is available where the government officer engages in a "reasonable exercise" of his official functions.[19] There is, however, no federal statute that is analogous, and neither section 1119 nor any of the incorporated title 18 provisions setting forth the substantive elements of the section 1119(b) offense, provide any express guidance as to the existence or scope of this justification.

Against this background, we believe the touchstone for the analysis of whether section 1119 incorporates not only justifications generally, but also the public authority justification in particular, is the legislative intent underlying this criminal statute. We conclude that the statute should be read to exclude from its prohibitory scope killings that are encompassed by traditional justifications, which include the public authority justification. There are no indications that Congress had a contrary intention. Nothing in the text or legislative history of sections 1111-1113 of title 18 suggests that Congress intended to exclude the established public authority justification from those that Congress otherwise must be understood to have imported through the use of the modifier "unlawful" in those statutes (which, as we explain above, establish the substantive scope of section 1119(b)).[20] Nor is there anything in the text or legislative history of section 1119 itself to suggest that Congress intended to abrogate or otherwise affect the availability under that statute of this traditional justification for killings. On the contrary, the relevant legislative materials indicate that in enacting section 1119 Congress was merely closing a gap in a field dealing with entirely different kinds of conduct than that at issue here. ·

The origin of section 1119 was a bill entitled the "Murder of United States Nationals Act of 1991," which Senator Thurmond introduced during the 102d Congress in response to the murder of an American in South Korea who had been teaching at a private school there. *See* 137 Cong. Rec. 8675-77 (1991) (statement of Sen. Thurmond). Shortly after the murder, another American teacher at the school accused a former colleague (who was also a U.S. citizen) of having committed the murder, and also confessed to helping the former colleague cover up the crime. The teacher who confessed was convicted in a South Korean court of destroying evidence and aiding the escape of a criminal suspect, but the individual she accused of murder had returned to the United States before the confession. *Id.* at 8675 The United States did not have

---

[18] *See, e.g.*, Ariz. Rev. Stat. § 13-410.C; Maine Rev. Stat. Ann. tit. 17, § 102.2.

[19] *See, e.g.*, Ala. Stat. § 13A-3-22; N.Y. Penal Law § 35.05(1); LaFave, *Substantive Criminal Law* § 10.2(b), at 135 n.15; *see also* Robinson, *Criminal Law Defenses* § 149(a), at 215 (proposing that the defense should be available only if the actor engages in the authorized conduct "when and to the extent necessary to protect or further the interest protected or furthered by the grant of authority" and where it "is reasonable in relation to the gravity of the harms or evils threatened and the importance of the interests to be furthered by such exercise of authority"); *id.* § 149(c), at 218-20.

[20] In concluding that the use of the term "unlawful" supports the conclusion that section 1119 incorporates the public authority justification, we do not mean to suggest that the absence of such a term would require a contrary conclusion regarding the intended application of a criminal statute to otherwise authorized government conduct in other cases. Each statute must be considered on its own terms to determine the relevant congressional intent. *See supra* note 16.ı

an extradition treaty with South Korea that would have facilitated prosecution of the alleged murderer and therefore, under then-existing law, "the Federal Government ha[d] no jurisdiction to prosecute a person residing in the United States who ha[d] murdered an American abroad except in limited circumstances, such as a terrorist murder or the murder of a Federal official." *Id.*

To close the "loophole under Federal law which permits persons who murder Americans in certain foreign countries to go punished," *id.*, the Thurmond bill would have added a new section to title 18 providing that "[w]hoever kills or attempts to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113 of this title." S. 861, 102d Cong. (1991) (incorporated in S. 1241, 102d Cong. §§ 3201-03 (1991)). The proposal also contained a separate provision amending the procedures for extradition "to provide the executive branch with the necessary authority, in the absence of an extradition treaty, to surrender to foreign governments those who commit violent crimes against U.S. nationals." 137 Cong. Rec. 8676 (1991) (statement of Sen. Thurmond) (discussing S. 861, 102d Cong., § 3).[21] The Thurmond proposal was incorporated into an omnibus crime bill that both the House and Senate passed, but that bill did not become law.

In the 103d Congress, a revised version of the Thurmond bill was included as part of the Violent Crime Control and Law Enforcement Act of 1994. H.R. 3355 § 60009, 103d Cong. (1994). The new legislation differed from the previous bill in two key respects. First, it prescribed criminal jurisdiction only where both the perpetrator and the victim were U.S. nationals, whereas the original Thurmond bill would have extended jurisdiction to all instances in which the victim was a U.S. national (based on so-called "passive personality" jurisdiction[22]). Second, the revised legislation did not include the separate provision from the earlier Thurmond legislation that would have amended the procedures for extradition. Congress enacted the revised legislation in 1994 as part of Public Law No. 103-322, and it was codified as section 1119 of title 18. *See* Pub. L. No. 103-322, § 60009, 108 Stat. 1796, 1972 (1994).

Thus, section 1119 was designed to close a jurisdictional loophole—exposed by a murder that had been committed abroad by a private individual—to ensure the possibility of prosecuting U.S. nationals who murdered other U.S. nationals in certain foreign countries that lacked the ability to lawfully secure the perpetrator's appearance at trial. This loophole had nothing to do with the conduct of an authorized military operation by U.S. armed forces or the sort of CIA counterterrorism operation contemplated here. Indeed, prior to the enactment of section 1119, the only federal statute expressly making it a crime to kill U.S. nationals abroad, at least outside the special and maritime jurisdiction of the United States,

---

[21] The Thurmond proposal also contained procedural limitations on prosecution virtually identical to those that Congress ultimately enacted and codified at 18 U.S.C. § 1119(c). *See* S. 861, 102d Cong. § 2.

[22] *See* Geoffrey R. Watson, *The Passive Personality Principle*, 28 Tex. Int'l L.J. 1, 13 (1993); 137 Cong. Rec. 8677 (1991) (letter for Senator Ernest F. Hollings, from Janet G. Mullins, Assistant Secretary, Legislative Affairs, U.S. State Department (Dec. 26, 1989), submitted for the record during floor debate on the Thurmond bill) (S4752 ("The United States has generally taken the position that the exercise of extraterritorial criminal jurisdiction based solely on the nationality of the victim interferes unduly with the application of local law by local authorities.").

18

reflected what appears to have been a particular concern with protection of Americans from terrorist attacks. *See* 18 U.S.C. § 2332(a), (d) (criminalizing unlawful killings of U.S. nationals abroad where the Attorney General or his subordinate certifies that the "offense was intended to coerce, intimidate, or retaliate against a government or a civilian population").[23] It therefore would be anomalous to now read section 1119's closing of a limited jurisdictional gap as having been intended to jettison important applications of the established public authority justification, particularly in light of the statute's incorporation of substantive offenses codified in statutory provisions that from all indications were intended to incorporate recognized justifications and excuses.

It is true that here the target of the contemplated operations would be a U.S. citizen. But we do not believe al-Aulaqi's citizenship provides a basis for concluding that section 1119 would fail to incorporate the established public authority justification for a killing in this case. As we have explained, section 1119 incorporates the federal murder and manslaughter statutes, and thus its prohibition extends only to "unlawful" killings, 18 U.S.C. §§ 1111, 1112, a category that was intended to include, from all of the evidence of legislative intent we can find, only those killings that may not be permissible in light of traditional justifications for such action. At the time the predecessor versions of sections 1111 and 1112 were enacted, it was understood that killings undertaken in accord with the public authority justification were not "unlawful" because they were justified. There is no indication that, because section 1119(b) proscribes the unlawful killing abroad of U.S. nationals by U.S. nationals, it silently incorporated all justifications for killings *except* that public authority justification.

### III.

Given that section 1119 incorporates the public authority justification, we must next analyze whether the contemplated DoD and CIA operations would be encompassed by that justification. In particular, we must analyze whether that justification would apply even though the target of the contemplated operations is a United States citizen. We conclude that it would— a conclusion that depends in part on our determination that each operation would accord with any potential constitutional protections of the United States citizen in these circumstances (*see infra* part VI). In reaching this conclusion, we do not address other cases or circumstances, involving different facts. Instead, we emphasize the sufficiency of the facts that have been represented to us here, without determining whether such facts would be necessary to the conclusion we reach.[24]

---

[23] Courts have interpreted other federal homicide statutes to apply extraterritorially despite the absence of an express provision for extraterritorial application. *See, e.g.*, 18 U.S.C. § 1114 (criminalizing unlawful killings of federal officers and employees); *United States v. Al Kassar*, 582 F. Supp. 2d 488, 497 (S.D.N.Y. 2008) (construing 18 U.S.C. § 1114 to apply extraterritorially).

[24] In light of our conclusion that section 1119 and the statutes it cross-references incorporate this justification, and that the operations here would be covered by that justification, we need not and thus do not address whether other grounds might exist for concluding that the operations would be lawful.

# A.

We begin with the contemplated DoD operation. We need not attempt here to identify the minimum conditions that might establish a public authority justification for that operation. In light of the combination of circumstances that we understand would be present, and which we describe below, we conclude that the justification would be available because the operation would constitute the "lawful conduct of war"—a well-established variant of the public authority justification.[25]

As one authority has explained by example, "if a soldier intentionally kills an enemy combatant in time of war and within the rules of warfare, he is not guilty of murder," whereas, for example, if that soldier intentionally kills a prisoner of war—a violation of the laws of war—"then he commits murder." 2 LaFave, *Substantive Criminal Law* § 10.2(c), at 136; *see also State v. Gut*, 13 Minn. 341, 357 (1868) ("That it is legal to kill an alien enemy in the heat and exercise of war, is undeniable; but to kill such an enemy after he laid down his arms, and especially when he is confined in prison, is murder."); Perkins & Boyce, *Criminal Law* at 1093 ("Even in time of war an alien enemy may not be killed needlessly after he has been disarmed and securely imprisoned").[26] Moreover, without invoking the public authority justification by terms, our Office has relied on the same notion in an opinion addressing the intended scope of a federal criminal statute that concerned the use of possibly lethal force. *See United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking*, 18 Op. O.L.C. 148, 164 (1994) ("*Shoot Down Opinion*") (concluding that the Aircraft Sabotage Act of 1984, 18 U.S.C. § 32(b)(2), which prohibits the willful destruction of a civil aircraft and otherwise applies to U.S. government conduct, should not be construed to have "the surprising and almost certainly

---

[25] *See, e.g.,* 2 Paul H. Robinson, *Criminal Law Defenses* § 148(a), at 208 (1984) (conduct that would violate a criminal statute is justified and thus not unlawful "[w]here the exercise of military authority relies upon the law governing the armed forces or upon the conduct of war"); 2 LaFave, *Substantive Criminal Law* § 10.2(c), at 136 ("another aspect of the public duty defense is where the conduct was required or authorized by 'the law governing the armed services or the lawful conduct of war'") (internal citation omitted); Perkins & Boyce, *Criminal Law* at 1093 (noting that a "typical instance[] in which even the extreme act of taking human life is done by public authority" involves "the killing of an enemy as an act of war and within the rules of war"); *Frye*, 10 Cal. Rptr. 2d at 221 n.2 (identifying "homicide done under a valid public authority, such as execution of a death sentence or killing an enemy in a time of war," as one example of a justifiable killing that would not be "unlawful" under the California statute describing murder as an "unlawful" killing); *State v. Gut*, 13 Minn. 341, 357 (1868) ("that it is legal to kill an alien enemy in the heat and exercise of war, is undeniable"); *see also* Model Penal Code § 3.03(2)(b) (proposing that criminal statutes expressly recognize a public authority justification for a killing that "occurs in the lawful conduct of war," notwithstanding the Code recommendation that the use of deadly force generally should be justified only if expressly prescribed by law); *see also id.* at 25 n.7 (collecting representative statutes reflecting this view enacted prior to Code's promulgation); 2 Robinson, *Criminal Law Defenses* § 148(b), at 210-11 nn.8-9 (collecting post-Model Code state statutes expressly recognizing such a defense).

[26] *Cf. Public Committee Against Torture in Israel v. Government of Israel*, HCJ 769/02 ¶ 19, 46 I.L.M. 375, 382 (Israel Supreme Court sitting as the High Court of Justice, 2006) ("When soldiers of the Israel Defense Forces act pursuant to the laws of armed conflict, they are acting 'by law', and they have a good justification defense [to criminal culpability]. However, if they act contrary to the laws of armed conflict they may be, *inter alia*, criminally liable for their actions."); *Calley v. Callaway*, 519 F.2d 184, 193 (5th Cir. 1975) ("an order to kill unresisting Vietnamese would be an illegal order, and . . . if [the defendant] knew the order was illegal or should have known it was illegal, obedience to an order was not a legal defense").

unintended effect of criminalizing actions by military personnel that are lawful under international law and the laws of armed conflict").

In applying this variant of the public authority justification to the contemplated DoD operation, we note as an initial matter that DoD would undertake the operation pursuant to Executive war powers that Congress has expressly authorized. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."). By authorizing the use of force against "organizations" that planned, authorized, and committed the September 11th attacks, Congress clearly authorized the President's use of "necessary and appropriate" force against al-Qaida forces, because al-Qaida carried out the September 11th attacks. *See* Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224, §2(a) (2001) (providing that the President may "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.").[27] And, as we have explained, *supra* at 9, a decision-maker could reasonably conclude that this leader of AQAP forces is part of al-Qaida forces. Alternatively, and as we have further explained, *supra* at 10 n.5, the AUMF applies with respect to forces "associated with" al-Qaida that are engaged in hostilities against the U.S. or its coalition partners, and a decision-maker could reasonably conclude that the AQAP forces of which al-Aulaqi is a leader are "associated with" al Qaida forces for purposes of the AUMF. On either view, DoD would carry out its contemplated operation against a leader of an organization that is within the scope of the AUMF, and therefore DoD would in that respect be operating in accord with a grant of statutory authority.

Based upon the facts represented to us, moreover, the target of the contemplated operation has engaged in conduct as part of that organization that brings him within the scope of the AUMF. High-level government officials have concluded, on the basis of al-Aulaqi's activities in Yemen, that al-Aulaqi is a leader of AQAP whose activities in Yemen pose a "continued and imminent threat" of violence to United States persons and interests. Indeed, the facts represented to us indicate that al-Aulaqi has been involved, through his operational and leadership roles within AQAP, in an abortive attack within the United States and continues to plot attacks intended to kill Americans from his base of operations in Yemen. The contemplated DoD operation, therefore, would be carried out against someone who is within the core of individuals against whom Congress has authorized the use of necessary and appropriate force.[28]

---

[27] We emphasize this point not in order to suggest that statutes such as the AUMF have superseded or implicitly repealed or amended section 1119, but instead as one factor that helps to make particularly clear why the operation contemplated here would be covered by the public authority justification that section 1119 (and section 1111) itself incorporates.

[28] *See Hamlily*, 616 F. Supp. at 75 (construing AUMF to reach individuals who "function[] or participate[] within or under the command structure of [al-Qaida]"); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 68 (D.D.C. 2009); *see also al-Marri v. Pucciarelli*, 534 F.3d 213, 325 (4th Cir. 2008) (en banc) (Wilkinson, J., dissenting in part) (explaining that the ongoing hostilities against al-Qaida permit the Executive to use necessary and appropriate force

21

Al-Aulaqi is a United States citizen, however, and so we must also consider whether his citizenship precludes the AUMF from serving as the source of lawful authority for the contemplated DoD operation. There is no precedent directly addressing the question in circumstances such as those present here; but the Supreme Court has recognized that, because military detention of enemy forces is "by 'universal agreement and practice,' [an] 'important incident[] of war,'" *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion) (quoting *Ex parte Quirin*, 317 U.S. 1, 28, 30 (1942)), the AUMF authorized the President to detain a member of Taliban forces who was captured abroad in an armed conflict against the United States on a traditional battlefield. *See id.* at 517-19 (plurality opinion).[29] In addition, the Court held in

---

under the AUMF against an "enemy combatant," a term Judge Wilkinson would have defined as a person who is (1) "a member of" (2) "an organization or nation against whom Congress has declared war or authorized the use of military force," and (3) who "knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of the enemy nation or organization"), *vacated and remanded sub nom. al-Marri v. Spagone*, 129 S. Ct. 1545 (2009); Government March 13th *Guantánamo Bay Detainee* Brief at 1 (arguing that AUMF authorizes detention of individuals who were "part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces").

Several of the Guantánamo habeas petitioners, as well as some commentators, have argued that in a non-international conflict of this sort, the laws of war and/or the AUMF do not permit the United States to treat persons who are part of al-Qaida as analogous to members of an enemy's armed forces in a traditional international armed conflict, but that the United States instead must treat all such persons as civilians, which (they contend) would permit targeting those persons only when they are directly participating in hostilities. *Cf. also al-Marri*, 534 F.3d at 237-47 (Motz, J. concurring in the judgment, and writing for four of nine judges) (arguing that the AUMF and the Constitution, as informed by the laws of war, do not permit military detention of an alien residing in the United States whom the government alleged was "closely associated with" al-Qaida, and that such individual must instead be treated as a civilian, because that person is not affiliated with the military arm of an enemy nation); Philip Alston, *Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions* ¶ 58, at 19 (United Nations Human Rights Council, Fourteenth Session, Agenda Item 3, May 28, 2010) (*"Report of the Special Rapporteur"*) (reasoning that because "[u]nder the [international humanitarian law] applicable to non-international armed conflict, there is no such thing as a 'combatant'"—i.e., a non-state actor entitled to the combatant's privilege—it follows that "States are permitted to attack only civilians who 'directly participate in hostilities'"). Primarily for the reasons that Judge Walton comprehensively examined in the *Gherebi* case, *see* 609 F. Supp. 2d at 62-69, we do not think this is the proper understanding of the laws of war in a non-international armed conflict, or of Congress's authorization under the AUMF. *Cf. also* International Committee of the Red Cross, *Interpretive Guidance on the Notion of Direct Participation in Hostilities Under International Humanitarian Law* 28, 34 (2009) (even if an individual is otherwise a "citizen" for purposes of the laws of war, a member of a non-state armed group can be subject to targeting by virtue of having assumed a "continuous combat function" on behalf of that group); Alston, *supra*, ¶ 65, at 30-31 (acknowledging that under the ICRC view, if armed group members take on a continuous command function, they can be targeted anywhere and at any time); *infra* at 37-38 (explaining that al-Aulaqi is continually and "actively" participating in hostilities and thus not protected by Common Article 3 of the Geneva Conventions).

[29] *See also Al Odah v. Obama*, No. 09-5331, 2010 WL 2679752, at *1, and other D.C. Circuit cases cited therein (D.C. Cir. 2010) (AUMF gives United States the authority to detain a person who is "part of" al-Qaida or Taliban forces); *Hamlily*, 616 F. Supp. 2d at 74 (Bates, J.); *Gherebi*, 609 F. Supp. 2d at 67 (Walton, J.); *Mattan v. Obama*, 618 F. Supp. 2d 24, 26 (D.D.C. 2009) (Lamberth, C. J.); *Al Mutairi v. United States*, 644 F. Supp. 2d 78, 85 (D.D.C. 2009) (Kollar-Kotelly, J.); *Awad v. Obama*, 646 F. Supp. 2d 20, 23 (D.D.C. 2009) (Robertson, J.); *Anam v. Obama*, 653 F. Supp. 2d 62, 64 (D.D.C. 2009) (Hogan, J.); *Hatim v. Obama*, 677 F. Supp. 2d 1, 7, (D.D.C. 2009) (Urbina, J.); *Al-Adahi v. Obama*, No. 05-280, 2009 WL 2584685 (D.D.C. Aug. 21, 2009) (Kessler, J.), *rev'd on other grounds*, No. 09-5333 (D.C. Cir. July 13, 2010).

*Hamdi* that this authorization applied even though the Taliban member in question was a U.S. citizen. *Id.* at 519-24; *see also Quirin*, 317 U.S. at 37-38 ("[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter [the United States] bent on hostile acts," may be treated as "enemy belligerents" under the law of war). Furthermore, lower federal courts have relied upon *Hamdi* to conclude that the AUMF authorizes DoD to detain individuals who are part of al-Qaida even if they are apprehended and transferred to U.S. custody while not on a traditional battlefield. *See, e.g., Bensayah v. Obama*, No. 08-5537, 2010 WL 2640626, at *1, *5, *8 (D.C. Cir. June 28, 2010) (concluding that the Department of Defense could detain an individual turned over to the U.S. in Bosnia if it demonstrates he was part of al-Qaida); *Al-Adahi v. Obama*, No. 09-5333 (D.C. Cir. July 13, 2010) (DoD has authority under AUMF to detain individual apprehended by Pakistani authorities in Pakistan and then transferred to U.S.); *Anam v. Obama*, 2010 WL 58965 (D.D.C. 2010) (same); *Razak Ali v. Obama*, 2009 WL 4030864 (D.D.C. 2009) (same); *Sliti v. Bush*, 592 F. Supp. 2d 46 (D.D.C. 2008) (same).

In light of these precedents, we believe the AUMF's authority to use lethal force abroad also may apply in appropriate circumstances to a United States citizen who is part of the forces of an enemy organization within the scope of the force authorization. The use of lethal force against such enemy forces, like military detention, is an "'important incident of war,'" *Hamdi*, 542 U.S. at 518 (plurality opinion) (quotation omitted). *See, e.g.,* General Orders No. 100: Instructions for the Government of Armies of the Untied States in the Field ¶ 15 (Apr. 24, 1863) (the "Lieber Code") ("[m]ilitary necessity admits of all direct destruction of life or limb of armed enemies"); International Committee of the Red Cross, *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 Aug. 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts (Additional Protocol II)* § 4789 (1987); Yoram Dinstein, *The Conduct of Hostilities Under the Law of International Armed Conflict* 94 (2004) ("*Conduct of Hostilities*") ("When a person takes up arms or merely dons a uniform as a member of the armed forces, he automatically exposes himself to enemy attack."). And thus, just as the AUMF authorizes the military detention of a U.S. citizen captured abroad who is part of an armed force within the scope of the AUMF, it also authorizes the use of "necessary and appropriate" lethal force against a U.S. citizen who has joined such an armed force. Moreover, as we explain further in Part VI, DoD would conduct the operation in a manner that would not violate any possible constitutional protections that al-Aulaqi enjoys by reason of his citizenship. Accordingly, we do not believe al-Aulaqi's citizenship provides a basis for concluding that he is immune from a use of force abroad that the AUMF otherwise authorizes.

In determining whether the contemplated DoD operation would constitute the "lawful conduct of war," LaFave, *Substantive Criminal Law* § 10.2(c), at 136, we next consider whether that operation would comply with the international law rules to which it would be subject—a question that also bears on whether the operation would be authorized by the AUMF. *See* Response for Petition for Rehearing and Rehearing En Banc, *Al Bihani v. Obama*, No. 09-5051 at 7 (D.C. Cir.) (May 13, 2010) (AUMF "should be construed, if possible, as consistent with international law") (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains")); *see also F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (customary international law is "law that (we must assume) Congress ordinarily

23

seeks to follow"). Based on the combination of facts presented to us, we conclude that DoD would carry out its operation as part of the non-international armed conflict between the United States and al-Qaida, and thus that on those facts the operation would comply with international law so long as DoD would conduct it in accord with the applicable laws of war that govern targeting in such a conflict.

In *Hamdan v. Rumsfeld*, the Supreme Court held that the United States is engaged in a non-international armed conflict with al-Qaida. 548 U.S. 557, 628-31 (2006). In so holding, the Court rejected the argument that non-international armed conflicts are limited to civil wars and other internal conflicts between a state and an internal non-state armed group that are confined to the territory of the state itself; it held instead that a conflict between a transnational non-state actor and a nation, occurring outside that nation's territory, is an armed conflict "not of an international character" (quoting Common Article 3 of the Geneva Conventions) because it is not a "clash between nations." *Id.* at 630.

Here, unlike in *Hamdan*, the contemplated DoD operation would occur in Yemen, a location that is far from the most active theater of combat between the United States and al-Qaida. That does not affect our conclusion, however, that the combination of facts present here would make the DoD operation in Yemen part of the non-international armed conflict with al-Qaida.[30] To be sure, *Hamdan* did not directly address the geographic scope of the non-international armed conflict between the United States and al-Qaida that the Court recognized, other than to implicitly hold that it extended to Afghanistan, where Hamdan was apprehended. *See* 548 U.S. at 566; *see also id.* at 641-42 (Kennedy, J., concurring in part) (referring to Common Article 3 as "applicable to our Nation's armed conflict with al Qaeda in Afghanistan"). The Court did, however, specifically reject the argument that non-international armed conflicts are necessarily limited to internal conflicts. The Common Article 3 term "conflict not of an international character," the Court explained, bears its "literal meaning"—namely, that it is a conflict that "does not involve a clash between nations." *Id.* at 630 (majority opinion). The Court referenced the statement in the 1949 ICRC Commentary on the Additional Protocols to the Geneva Conventions that a non-international armed conflict "'is distinct from an international armed conflict *because of the legal status of the entities opposing each other,*'" *id.* at 631 (emphasis added). The Court explained that this interpretation—that the nature of the conflict depends at least in part on the status of the parties, rather than simply on the locations in which they fight—in turn accords with the view expressed in the commentaries to the Geneva Conventions that "the scope of application" of Common Article 3, which establishes basic protections that govern conflicts not of an international character, "must be as wide as possible.'" *Id.*[31]

---

[30] Our analysis is limited to the circumstances presented here, regarding the contemplated use of lethal force in Yemen. We do not address issues that a use of force in other locations might present. *See also supra* note 1.

[31] We think it is noteworthy that the AUMF itself does not set forth an express geographic limitation on the use of force it authorizes, and that nearly a decade after its enactment, none of the three branches of the United States Government has identified a strict geographical limit on the permissible scope of the authority the AUMF confers on the President with respect to this armed conflict. *See, e.g.*, Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (June 15, 2010) (reporting, "consistent with . . . the War Powers Resolution," that the armed forces, with the assistance of numerous international partners,

Invoking the principle that for purposes of international law an armed conflict generally exists only when there is "protracted armed violence between governmental authorities and armed groups," Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction, *Prosecutor v. Tadic*, Case No. IT-94-1AR72, ¶ 70 (ICTY App. Chamber Oct. 2, 1995) ("*Tadic* Jurisdictional Decision"), some commentators have suggested that the conflict between the United States and al-Qaida cannot extend to nations outside Afghanistan in which the level of hostilities is less intense or prolonged than in Afghanistan itself. *See, e.g.*, Mary Ellen O'Connell, *Combatants and the Combat Zone*, 43 U. Rich. L. Rev. 845, 857-59 (2009); *see also* Philip Alston, *Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions* ¶ 54, at 18 (United Nations Human Rights Council, Fourteenth Session, Agenda Item 3, May 28, 2010) (acknowledging that a non-international armed conflict can be transnational and "often does" exist "across State borders," but explaining that the duration and intensity of attacks in a particular nation is also among the "cumulative factors that must be considered for the objective existence of an armed conflict"). There is little judicial or other authoritative precedent that speaks directly to the question of the geographic scope of a non-international armed conflict in which one of the parties is a transnational, non-state actor and where the principal theater of operations is not within the territory of the nation that is a party to the conflict. Thus, in considering this issue, we must look to principles and statements from analogous contexts, recognizing that they were articulated without consideration of the particular factual circumstances of the sort of conflict at issue here.

In looking for such guidance, we have not come across any authority for the proposition that when one of the parties to an armed conflict plans and executes operations from a base in a new nation, an operation to engage the enemy in that location can never be part of the original armed conflict—and thus subject to the laws of war governing that conflict—unless and until the hostilities become sufficiently intensive and protracted within that new location. That does not appear to be the rule, or the historical practice, for instance, in a traditional international conflict. *See* John R. Stevenson, Legal Adviser, Department of State, *United States Military Action in Cambodia: Questions of International Law* (address before the Hammarskjold Forum of the Association of the Bar of the City of New York, May 28, 1970), *in* 3 *The Vietnam War and International Law: The Widening Context* 23, 28-30 (Richard A. Falk, ed. 1972) (arguing that in an international armed conflict, if a neutral state has been unable for any reason to prevent violations of its neutrality by the troops of one belligerent using its territory as a base of operations, the other belligerent has historically been justified in attacking those enemy forces in that state). Nor do we see any obvious reason why that more categorical, nation-specific rule should govern in analogous circumstances in this sort of non-international armed conflict.[32]

---

continue to conduct operations "against al-Qa'ida terrorists," and that the United States has "deployed combat-equipped forces to a number of locations in the U.S. Central . . . Command area[] of operation in support of those [overseas counter-terrorist] operations"); Letter for the Speaker of the House of Representatives and the President Pro Tempore of the Senate, from President Barack Obama (Dec. 16, 2009) (similar); *DoD May 18 Memorandum for OLC*, at 2 (explaining that U.S. armed forces have conducted        AQAP targets in Yemen since December 2009, and that DoD has reported such strikes to the appropriate congressional oversight committees).

[32] In the speech cited above, Legal Adviser Stevenson was referring to cases in which the government of the nation in question is unable to prevent violations of its neutrality by belligerent troops.

Rather, we think the determination of whether a particular operation would be part of an ongoing armed conflict for purposes of international law requires consideration of the particular facts and circumstances present in each case. Such an inquiry may be particularly appropriate in a conflict of the sort here, given that the parties to it include transnational non-state organizations that are dispersed and that thus may have no single site serving as their base of operations.[33]

We also find some support for this view in an argument the United States made to the International Criminal Tribunal for Yugoslavia (ICTY) in 1995. To be sure, the United States was there confronting a question, and a conflict, quite distinct from those we address here. Nonetheless, in that case the United States argued that in determining *which* body of humanitarian law applies in a particular conflict, "the conflict must be considered as a whole," and that "it is artificial and improper to attempt to divide it into isolated segments, either geographically or chronologically, in an attempt to exclude the application of [the relevant] rules." Submission of the Government of the United States of America Concerning Certain Arguments Made by Counsel for the Accused in the Case of *The Prosecutor of the Tribunal v. Dusan Tadic*, Case No. IT-94-1AR72 (ICTY App. Chamber) at 27-28 (July 1995) ("U.S. *Tadic* Submission"). Likewise, the court in *Tadic*—although not addressing a conflict that was transnational in the way the U.S. conflict with al-Qaida is—also concluded that although "the definition of 'armed conflict' varies depending on whether the hostilities are international or internal . . . the scope of both internal and international armed conflicts *extends beyond the exact time and place of hostilities.*" *Tadic* Jurisdictional Decision ¶ 67 (emphasis added); *see also* International Committee of the Red Cross, *International Humanitarian Law and the Challenges of Contemporary Armed Conflicts* 18 (2003) (asserting that in order to assess whether an armed conflict exists it is necessary to determine "whether the totality of the violence taking place between states and transnational networks can be deemed to be armed conflict in the legal sense"). Although the basic approach that the United States proposed in *Tadic*, and that the ICTY may be understood to have endorsed, was advanced without the current conflict between the U.S. and al-Qaida in view, that approach reflected a concern with ensuring that the laws of war, and the limitations on the use of force they establish, should be given an appropriate application.[34] And that same consideration, reflected in *Hamdan* itself, *see supra* at 24, suggests

---

[33] The fact that the operation occurs in a new location might alter the way in which the military must apply the relevant principles of the laws of war—for example, requiring greater care in some locations in order to abide by the principles of distinction and proportionality that protect civilians from the use of military force. But that possible distinction should not affect the question of whether the laws of war govern the conflict in that new location in the first instance

[34] *See also* Geoffrey S. Corn & Eric Talbot Jensen, *Untying the Gordian Knot: A Proposal for Determining Applicability of the Laws of War to the War on Terror*, 81 Temp. L. Rev. 787, 799 (2008) ("If . . . the ultimate purpose of the drafters of the Geneva Conventions was to prevent 'law avoidance' by developing de facto law triggers—a purpose consistent with the humanitarian foundation of the treaties—then the myopic focus on the geographic nature of an armed conflict in the context of transnational counterterrorist combat operations serves to frustrate that purpose."); *cf. also* Derek Jinks, *September 11 and the Laws of War*, 28 Yale J. Int'l L. 1, 40-41 (2003) (arguing that if Common Article 3 applies to wholly internal conflicts, then it "applies a fortiori to armed conflicts with international or transnational dimensions," such as to the United States's armed conflict with al-Qaida).

26

a further reason for skepticism about an approach that would categorically deny that an operation is part of an armed conflict absent a specified level and intensity of hostilities in the particular location where it occurs.

For present purposes, in applying the more context-specific approach to determining whether an operation would take place within the scope of a particular armed conflict, it is sufficient that the facts as they have been represented to us here, in combination, support the judgment that DoD's operation in Yemen would be conducted as part of the non-international armed conflict between the United States and al-Qaida. Specifically, DoD proposes to target a leader of AQAP, an organized enemy force[35] that is either a component of al-Qaida or that is a co-belligerent of that central party to the conflict and engaged in hostilities against the United States as part of the same comprehensive armed conflict, in league with the principal enemy. *See supra at* 9-10 & n.5. Moreover, DoD would conduct the operation in Yemen, where, according to the facts related to us, AQAP has a significant and organized presence, and from which AQAP is conducting terrorist training in an organized manner and has executed and is planning to execute attacks against the United States. Finally, the targeted individual himself, on behalf of that force, is continuously planning attacks from that Yemeni base of operations against the United States, as the conflict with al-Qaida continues. *See supra at* 7-9. Taken together, these facts support the conclusion that the DoD operation would be part of the non-international armed conflict the Court recognized in *Hamdan*.[36]

---

[35] *Cf. Prosecutor v. Haradnizaj*, No IT-04-84-T 60 (ICTY Trial Chamber I, 2008) ("an armed conflict can exist only between parties that are sufficiently organized to confront each other with military means—a condition that can be evaluated with respect to non-state groups by assessing "several indicative factors, none of which are, in themselves, essential to establish whether the 'organization' criterion is fulfilled," including, among other things, the existence of a command structure, and disciplinary rules and mechanisms within the group, the ability of the group to gain access to weapons, other military equipment, recruits and military training, and its ability to plan, coordinate, and carry out military operations).

[36] We note that the Department of Defense, which has a policy of compliance with the law of war "during all armed conflicts, however such conflicts are characterized, *and in all other military operations*," Chairman of the Joint Chiefs of Staff, Instruction 5810.01D, *Implementation of the DoD Law of War Program* ¶ 4.a, at 1 (Apr. 30, 2010) (emphasis added), has periodically used force—albeit in contexts different from a conflict such as this—in situations removed from "active battlefields," in response to imminent threats. *See, e.g.*, Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 116-17 (2004) (describing 1998 cruise missile attack on al-Qaida encampments in Afghanistan following al-Qaida bombings of U.S. embassies in East Africa); W. Hays Parks, *Memorandum of Law: Executive Order 12333 and Assassination*, Army Lawyer, at 7 (Dep't of Army Pamphlet 27-50-204) (Dec. 1989) ("*Assassination*") at 7 n.8 (noting examples of uses of military force in "[s]elf defense against a continuing threat," including "the U.S. Navy air strike against Syrian military objections in Lebanon on 4 December 1983, following Syrian attacks on U.S. Navy F-14 TARPS flights supporting the multinational peacekeeping force in Beirut the preceding day," and "air strikes against terrorist-related targets in Libya on the evening of 15 April 1986"); *see also id.* at 7 ("A national decision to employ military force in self defense against a legitimate terrorist or related threat would not be unlike the employment of force in response to a threat by conventional forces; only the nature of the threat has changed, rather than the international legal right of self defense. The terrorist organizations envisaged as appropriate to necessitate or warrant an armed response by U.S. forces are well-financed, highly-organized paramilitary structures engaged in the illegal use of force."); Advisory Opinion of 8 July 1996 on the Legality of the Threat or Use of Nuclear Weapons ¶ 42, 1996 I.C.J. 226, 245 ("Nuclear Weapons Advisory Opinion") (fundamental law-of-war norms are applicable even where military force might be employed outside the context of an armed conflict, such as when using powerful weapons in an act of national self-defense); *cf. also 9/11 Commission Report* at 116-17 (noting the Clinton Administration position—with respect to a presidential memorandum authorizing CIA assistance to an operation that could result in the killing of Usama Bin Ladin "if the CIA and the tribals judged that capture was not feasible"—that "under the law of armed

There remains the question whether DoD would conduct its operation in accord with the rules governing targeting in a non-international armed conflict—namely, international humanitarian law, commonly known as the laws of war. *See* Dinstein, *Conduct of Hostilities* at 17 (international humanitarian law "takes a middle road, allowing belligerent States much leeway (in keeping with the demands of military necessity) and yet circumscribing their freedom of action (in the name of humanitarianism")).[37] The 1949 Geneva Conventions to which the United States is a party do not themselves directly impose extensive restrictions on the conduct of a non-international armed conflict—with the principal exception of Common Article 3, *see Hamdan*, 548 U.S. at 630-31. But the norms specifically described in those treaties "are not exclusive, and the laws and customs of war also impose limitations on the conduct of participants in non-international armed conflict." U.S. *Tadic* Submission at 33 n.53; *see also, e.g.*, Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, Preamble ("Hague Convention (IV)"), 36 Stat. 2277, 2280 (in cases "not included" under the treaty, "the inhabitants and the belligerents remain under the protection and the rule of the principles of the law of nations, as they result from the usages among civilized peoples, from the laws of humanity, and the dictates of the public conscience").

In particular, the "fundamental rules" and "intransgressible principles of international customary law," Advisory Opinion of 8 July 1996 on the Legality of the Threat or Use of Nuclear Weapons ¶ 79, 1996 I.C.J. 226, 257 ("Nuclear Weapons Advisory Opinion"), which apply to all armed conflicts, include the "four fundamental principles that are inherent to all targeting decisions"—namely, military necessity, humanity (the avoidance of unnecessary suffering), proportionality, and distinction. United States Air Force, *Targeting*, Air Force Doctrine Document 2-1.9, at 88 (June 8, 2006); *see also generally id.* at 88-92; Dinstein, *Conduct of Hostilities* at 16-20, 115-16, 119-23. Such fundamental rules also include those listed in the annex to the Fourth Hague Convention, *see* Nuclear Weapons Advisory Opinion ¶ 80, at 258, article 23 of which makes it "especially forbidden" to, inter alia, kill or wound treacherously, refuse surrender, declare a denial of quarter, or cause unnecessary suffering, 36 Stat. at 2301-02.

---

conflict, killing a person who posed an imminent threat to the United States would be an act of self-defense, not an assassination"). As we explain below, DoD likewise would conduct the operation contemplated here in accord with the laws of war and would direct its lethal force against an individual whose activities have been determined to pose a "continued and imminent threat" to U.S. persons and interests.

[37] *Cf.* Nuclear Weapons Advisory Opinion ¶ 25, 1996 I.C.J. at 240 (explaining that the "test" of what constitutes an "arbitrary" taking of life under international human rights law, such as under article 6(1) of the International Covenant of Civil and Political Rights (ICCPR), must be determined by "the law applicable in armed conflict which is designed to regulate the conduct of hostilities," and "can only be decided by reference to the law applicable in armed conflict and not deduced from terms of the Covenant itself"); Written Statement of the Government of the United States of America before the International Court of Justice, *Re: Request by the United Nations General Assembly for an Advisory Opinion on the Legality of the Threat or Use of Nuclear Weapons* at 44 (June 20, 1995) (ICCPR prohibition on arbitrary deprivation of life "was clearly understood by its drafters to exclude the lawful taking of human life," including killings "lawfully committed by the military in time of war"); Dinstein, *Conduct of Hostilities* at 23 (right to life under human rights law "does not protect persons from the ordinary consequences of hostilities"); *cf. also infra* Part VI (explaining that the particular contemplated operations here would satisfy due process and Fourth Amendment standards because, *inter alia*, capturing al-Aulaqi is currently infeasible).

28

DoD represents that it would conduct its operation against al-Aulaqi in compliance with these fundamental law-of-war norms. *See* Chairman of the Joint Chiefs of Staff, Instruction 5810.01D, *Implementation of the DoD Law of War Program* ¶ 4.a, at 1 (Apr. 30, 2010) ("It is DOD policy that . . . [m]embers of the DOD Components comply with the law of war during all armed conflicts, however such conflicts are characterized, and in all other military operations."). In particular, the targeted nature of the operation would help to ensure that it would comply with the principle of distinction, and DoD has represented to us that it would make every effort to minimize civilian casualties and that the officer who launches the ordnance would be required to abort a strike if he or she concludes that civilian casualties will be disproportionate or that such a strike will in any other respect violate the laws of war. *See DoD May 18 Memorandum for OLC*, at 1 ("Any official in the chain of command has the authority and duty to abort" a strike "if he or she concludes that civilian casualties will be disproportionate or that such a strike will otherwise violate the laws of war.").

Moreover, although DoD would specifically target al-Aulaqi, and would do so without advance warning, such characteristics of the contemplated operation would not violate the laws of war and, in particular, would not cause the operation to violate the prohibitions on treachery and perfidy—which are addressed to conduct involving a breach of confidence by the assailant. *See, e.g.*, Hague Convention IV, Annex, art. 23(b), 36 Stat. at 2301-02 ("[I]t is especially forbidden . . . to kill or wound treacherously individuals belonging to the hostile nation or army"); *cf. also* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, art. 37(1) (prohibiting the killing, injuring or capture of an adversary in an international armed conflict by resort to acts "inviting the confidence of [the] adversary. . . with intent to betray that confidence," including feigning a desire to negotiate under truce or flag of surrender; feigning incapacitation; and feigning noncombatant status).[38] Those prohibitions do not categorically preclude the use of stealth or surprise, nor forbid military attacks on identified, individual soldiers or officers, *see* U.S. Army Field Manual 27-10, ¶ 31 (1956) (article 23(b) of the Annex to the Hague Convention IV does not "preclude attacks on individual soldiers or officers of the enemy whether in the zone of hostilities, occupied territory, or else-where"), and we are not aware of any other law-of-war grounds precluding the use of such tactics. *See* Dinstein, *Conduct of Hostilities* at 94-95, 199; Abraham D. Sofaer, *Terrorism, The Law, and the National Defense*, 126 Mil. L. Rev. 89, 120-21 (1989).[39] Relatedly, "there is no prohibition under the laws of war on the use of technologically advanced weapons systems in armed conflict—such as pilotless aircraft or so-called smart

---

[38] Although the United States is not a party to the First Protocol, the State Department has announced that "we support the principle that individual combatants not kill, injure, or capture enemy personnel by resort to perfidy." Remarks of Michael J, Matheson, Deputy Legal Adviser, Department of State, *The Sixth Annual American Red Cross-Washington College of Law Conference on International Humanitarian Law: A Workshop on Customary International Law and the 1977 Protocols Additional to the 1949 Geneva Conventions*, 2 Am. U. J. of Int'l L. & Pol'y 415, 425 (1987). (U)

[39] There is precedent for the United States targeting attacks against particular commanders. *See, e.g.*, Patricia Zengel, *Assassination and the Law of Armed Conflict*, 134 Mil. L. Rev. 123, 136-37 (1991) (describing American warplanes' shoot-down during World War II of plane carrying Japanese Admiral Isoroku Yamamoto); *see also* Parks, *Assassination*, Army Lawyer at 5.

29

bombs—as long as they are employed in conformity with applicable laws of war." Koh, *The Obama Administration and International Law*. DOD also informs us that if al-Aulaqi offers to surrender, DoD would accept such an offer.[40]

In light of all these circumstances, we believe DoD's contemplated operation against al-Aulaqi would comply with international law, including the laws of war applicable to this armed conflict, and would fall within Congress's authorization to use "necessary and appropriate force" against al-Qaida. In consequence, the operation should be understood to constitute the lawful conduct of war and thus to be encompassed by the public authority justification. Accordingly, the contemplated attack, if conducted by DoD in the manner described, would not result in an "unlawful" killing and thus would not violate section 1119(b).

### B.

We next consider whether the CIA's contemplated operation against al-Aulaqi in Yemen would be covered by the public authority justification. We conclude that it would be; and thus that operation, too, would not result in an "unlawful" killing prohibited by section 1119. As with our analysis of the contemplated DoD operation, we rely on the sufficiency of the particular factual circumstances of the CIA operation as they have been represented to us, without determining that the presence of those specific circumstances would be necessary to the conclusion we reach.

---

[40] *See* Geneva Conventions Common Article 3(1) (prohibiting "violence to life and person, in particular murder of all kinds," with respect to persons "taking no active part in the hostilities" in a non-international armed conflict, "including members of armed forces who have laid down their arms"); *see also* Hague Convention IV, Annex, art. 23(c), 37 Stat. at 2301-02 ("it is especially forbidden . . . [t]o kill or wound an enemy who, having laid down his arms, or having no longer means of defence, has surrendered at discretion"); *id.* art. 23(d) (forbidding a declaration that no quarter will be given); 2 William Winthrop, *Military Law and Precedents* 788 (1920) ("The time has long passed when 'no quarter' was the rule on the battlefield, or when a prisoner could be put to death simply by virtue of his capture.").

We explain in Part VI why the Constitution would impose no bar to the CIA's contemplated operation under these circumstances, based on the facts as they have been represented to us. There thus remains the question whether that operation would violate any statutory restrictions, which in turn requires us to consider whether 18 U.S.C. § 1119 would apply to the contemplated CIA operation.[42] Based on the combination of circumstances that we understand would be present, we conclude that the public authority justification that section 1119 incorporates—and that would prevent the contemplated DoD operation from violating section 1119(b)—would also encompass the contemplated CIA operation.[43]

---

[42] We address potential restrictions imposed by two other criminal laws—18 U.S.C. §§ 956(a) and 2441—in Parts IV and V of this opinion.

[43] We note, in addition, that the "lawful conduct of war" variant of the public authority justification, although often described with specific reference to operations conducted by the armed forces, is not necessarily limited to operations by such forces; some descriptions of that variant of the justification, for example, do not imply such a limitation. *See, e.g., Frye*, 10 Cal. Rptr. 2d at 221 n.2 ("homicide done under a valid public authority, such as execution of a death sentence or killing an enemy in a time of war"); Perkins & Boyce, *Criminal Law* at 1093 ("the killing of an enemy as an act of war and within the rules of war").

Specifically, we understand that the CIA, like DoD, would carry out the attack against an operational leader of an enemy force, as part of the United States's ongoing non-international armed conflict with al-Qaida.

            the CIA—
—would conduct the operation in a manner that accords with the rules of international humanitarian law governing this armed conflict, and in circumstances

*See supra* at 10-11.[44]

---

[44]

If the killing by a member of the armed forces would comply with the law of war and otherwise be lawful, actions of CIA officials facilitating that killing should also not be unlawful. *See, e.g., Shoot Down Opinion* at 165 n. 33 ("[O]ne cannot be prosecuted for aiding and abetting the commission of an act that is not itself a crime.") (citing *Shuttlesworth v. City of Birmingham*, 373 U.S. 262 (1963)).

Nor would the fact that CIA personnel would be involved in the operation itself cause the operation to violate the laws of war. It is true that CIA personnel, by virtue of their not being part of the armed forces, would not enjoy the immunity from prosecution under the domestic law of the countries in which they act for their conduct in targeting and killing enemy forces in compliance with the laws of war—an immunity that the armed forces enjoy by virtue of their status. *See Report of the Special Rapporteur* ¶ 71, at 22; *see also* Dinstein, *Conduct of Hostilities*, at 31. Nevertheless, lethal activities conducted in accord with the laws of war, and undertaken in the course of lawfully authorized hostilities, do not violate *the laws of war* by virtue of the fact that they are carried out in part by government actors who are not entitled to the combatant's privilege. The contrary view "arises . . . from a fundamental confusion between acts punishable under international law and acts with respect to which international law affords no protection." Richard R. Baxter, *So-Called "Unprivileged Belligerency": Spies, Guerillas, and Saboteurs*, 28 Brit. Y.B. Int'l L. 323, 342 (1951) ("the law of nations has not ventured to require of states that they . . . refrain from the use of secret agents or that these activities upon the part of their military forces or civilian population be punished"). *Accord* Yoram Dinstein, *The Distinction Between Unlawful Combatants and War Criminals*, in *International Law at a Time of Perplexity: Essays in Honour of Shabtai Rosenne* 103-16 (Y. Dinstein ed., 1989);

          Statements in the Supreme Court's decision in *Ex parte Quirin*, 317 U.S. 1 (1942), are sometimes cited for the contrary view. *See, e.g., id.* at 36 n.12 (suggesting that passing through enemy lines in order to commit "any hostile act" while not in uniform "renders the offender liable to trial for violation of the laws of war"); *id.* at 31 (enemies who come secretly through the lines for purposes of waging war by destruction of life or property "without uniform" not only are "generally not to be entitled to the status of prisoners of war," but also "to be offenders against the law of war subject to trial and punishment by military tribunals"). Because the Court in *Quirin* focused on conduct taken behind enemy lines, it is not clear whether the Court in these passages intended to refer only to conduct that would constitute perfidy or treachery. To the extent the Court meant to suggest more broadly that any hostile acts performed by unprivileged belligerents are *for that reason* violations of the laws of war, the authorities the Court cited (the Lieber Code and Colonel Winthrop's military law treatise) do not provide clear support. *See* John C. Dehn, *The Hamdan Case and the Application of a Municipal Offense*, 7 J. Int'l Crim. J. 63, 73-79 (2009); *see also* Baxter, *So-Called "Unprivileged Belligerency,"* 28 Brit. Y.B. Int'l L. at 339-40; Michael N. Schmitt, *Humanitarian Law and Direct Participation in Hostilities by Private Contractors or Civilian Employees*, 5 Chi. J. Int'l L. 511, 521 n.45 (2005); W. Hays Parks, *Special Forces' Wear of Non-Standard Uniforms*, 4 Chic. J. Int'l L. 493, 510-11 n.31 (2003). We note

Nothing in the text or legislative history of section 1119 indicates that Congress intended to criminalize such an operation. Section 1119 incorporates the traditional public authority justification, and did not impose any special limitation on the scope of that justification. As we have explained, *supra* at 17-19, the legislative history of that criminal prohibition revealed Congress's intent to close a jurisdictional loophole that would have hindered prosecutions of murders carried out by private persons abroad. It offers no indication that Congress intended to prohibit the targeting of an enemy leader during an armed conflict in a manner that would accord with the laws of war when performed by a duly authorized government agency. Nor does it indicate that Congress, in closing the identified loophole, meant to place a limitation on the CIA that would not apply to DoD.

Thus, we conclude that just as Congress did not intend section 1119 to bar the particular attack that DoD contemplates, neither did it intend to prohibit a virtually identical attack on the same target, in the same authorized conflict and in similar compliance with the laws of war, that the CIA would carry out in accord with

---

in this regard that DoD's current Manual for Military Commissions does not endorse the view that the commission of an unprivileged belligerent act, without more, constitutes a violation of the international law of war. *See* Manual for Military Commissions, Part IV, § 5(13), Comment, at IV-11 (2010 ed., Apr. 27, 2010) (murder or infliction of serious bodily injury "committed while the accused did not meet the requirements of privileged belligerency" can be tried by a military commission "even if such conduct does not violate the international law of war").

[45] As one example, the Senate Report pointed to the Department of Justice's conclusion that the Neutrality Act, 18 U.S.C. § 960, prohibits conduct by private parties but is not applicable to the CIA and other government agencies. *Id.* The Senate Report assumed that the Department's conclusion about the Neutrality Act was premised on the assertion that in the case of government agencies, there is an "absence of the mens rea necessary to the offense." *Id.* In fact, however, this Office's conclusion about that Act was not based on questions of mens rea, but instead on a careful analysis demonstrating that Congress did not intend the Act, despite its words of general applicability, to apply to the activities of government officials acting within the course and scope of their duties as officers of the United States. *See Application of Neutrality Act to Official Government Activities*, 8 Op. O.L.C. 58 (1984).

34

*See also infra* at 38-41 (explaining that the CIA operation under the circumstances described to us would comply with constitutional due process and the Fourth Amendment's "reasonableness" test for the use of deadly force).

Accordingly, we conclude that, just as the combination of circumstances present here supports the judgment that the public authority justification would apply to the contemplated operation by the armed forces, the combination of circumstances also supports the judgment that the CIA's operation, too, would be encompassed by that justification. The CIA's contemplated operation, therefore, would not result in an "unlawful" killing under section 1111 and thus would not violate section 1119.

## IV.

For similar reasons, we conclude that the contemplated DoD and CIA operations would not violate another federal criminal statute dealing with "murder" abroad, 18 U.S.C. § 956(a). That law makes it a crime to conspire within the jurisdiction of the United States "to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States" if any conspirator acts within the United States to effect any object of the conspiracy.

---

[46] *Cf. also VISA Fraud Investigation,* 8 Op. O.L.C. at 287 (applying similar analysis in evaluating the effect of criminal prohibitions on certain otherwise authorized law enforcement operations, and explaining that courts have recognized it may be lawful for law enforcement agents to disregard otherwise applicable laws "when taking action that is necessary to attain the permissible law enforcement objective, when the action is carried out in a reasonable fashion"); *id.* at 288 (concluding that issuance of an otherwise unlawful visa that was necessary for undercover operation to proceed, and done in circumstances—"for a limited purpose and under close supervision"—that were "reasonable," did not violate federal statute).

Like section 1119(b), section 956(a) incorporates by reference the understanding of "murder" in section 1111 of title 18. For reasons we explained earlier in this opinion, *see supra* at 12-14, section 956(a) thus incorporates the traditional public authority justification that section 1111 recognizes. As we have further explained both the CIA and DoD operations, on the facts as they have been represented to us, would be covered by that justification. Nor do we believe that Congress's reference in section 956(a) to "the special maritime and territorial jurisdiction of the United States" reflects an intent to transform such a killing into a "murder" in these circumstances—notwithstanding that our analysis of the applicability of the public authority justification is limited for present purposes to operations conducted abroad. A contrary conclusion would require attributing to Congress the surprising intention of criminalizing through section 956(a) an otherwise lawful killing of an enemy leader that another statute specifically prohibiting the murder of U.S. nationals abroad does not prohibit.

The legislative history of section 956(a) further confirms our conclusion that that statute should not be so construed. When the provision was first introduced in the Senate in 1995, its sponsors addressed and rejected the notion that the conspiracy prohibited by that section would apply to "duly authorized" actions undertaken on behalf of the federal government. Senator Biden introduced the provision at the behest of the President, as part of a larger package of anti-terrorism legislation. *See* 141 Cong. Rec. 4491 (1995) (statement of Sen. Biden). He explained that the provision was designed to "fill[] a void in the law," because section 956 at the time prohibited only U.S.-based conspiracies to commit certain property crimes abroad, and did not address crimes against persons. *Id.* at 4506. The amendment was designed to cover an offense "committed by terrorists" and was "intended to ensure that the government is able to punish those persons who use the United States as a base in which to plot such a crime to be carried out outside the jurisdiction of the United States." *Id.* Notably, the sponsors of the new legislation deliberately declined to place the new offense either within chapter 19 of title 18, which is devoted to "Conspiracy," or within chapter 51, which collects "Homicide" offenses (including those established in sections 1111, 1112, 1113 and 1119). Instead, as Senator Biden explained, "[s]ection 956 is contained in chapter 45 of title 18, United States Code, relating to interference with the foreign relations of the United States," and thus was intended to "cover[] those individuals who, without appropriate governmental authorization, engage in prohibited conduct that is harmful to the foreign relations of the United States." *Id.* at 4507. Because, as Senator Biden explained, the provision was designed, like other provisions of chapter 45, to prevent private interference with U.S. foreign relations, "[i]t is not intended to apply to duly authorized actions undertaken on behalf of the United States Government." *Id.*; *see also* 8 Op. O.L.C. 58 (1984) (concluding that section 5 of the Neutrality Act, 18 U.S.C. § 960, which is also in chapter 45 and which forbids the planning of, or participation in, military or naval expeditions to be carried on from the United States against a foreign state with which the United States is at peace, prohibits only persons acting in their private capacity from engaging in such conduct, and does not proscribe activities undertaken by government officials acting within the course and scope of their duties as United States officers). Senator Daschle expressed this same understanding when he introduced the identical provision in a different version of the anti-terrorism legislation a few months later. *See* 141 Cong. Rec. 11,960 (1995) (statement of Sen. Daschle). Congress enacted the new section 956(a) the following year, as part of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, tit. VII, § 704(a), 110 Stat. 1214, 1294-95 (1996). As far as

36

we have been able to determine, the legislative history contains nothing to contradict the construction of section 956(a) described by Senators Biden and Daschle.

Accordingly, we do not believe section 956(a) would prohibit the contemplated operations.

## V.

We next consider the potential application of the War Crimes Act, 18 U.S.C. § 2441, which makes it a federal crime for a member of the Armed Forces or a national of the United States to "commit[] a war crime." *Id.* § 2441(a). Subsection 2441(c) defines a "war crime" for purposes of the statute to mean any conduct (i) that is defined as a grave breach in any of the Geneva Conventions (or any Geneva protocol to which the U.S. is a party); (ii) that is prohibited by four specified articles of the Fourth Hague Convention of 1907; (iii) that is a "grave breach" of Common Article 3 of the Geneva Conventions (as defined elsewhere in section 2441) when committed "in the context of and in association with an armed conflict not of an international character"; or (iv) that is a willful killing or infliction of serious injury in violation of the 1996 Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices. Of these, the only subsection potentially applicable here is that dealing with Common Article 3 of the Geneva Conventions.[47]

In defining what conduct constitutes a "grave breach" of Common Article 3 for purposes of the War Crimes Act, subsection 2441(d) includes "murder," described in pertinent part as "[t]he act of a person who intentionally kills, or conspires or attempts to kill . . . one or more persons taking no active part in the hostilities, including those placed out of combat by sickness, wounds, detention, or any other cause." 18 U.S.C. § 2441(d)(1)(D). This language derives from Common Article 3(1) itself, which prohibits certain acts (including murder) against "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed '*hors de combat*' by sickness, wounds, detention, or any other cause." *See, e.g.*, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955], art. 3(1), 6 U.S.T. 3316, 3318-20. Although Common Article 3 is most commonly applied with respect to persons within a belligerent party's control, such as detainees, the language of the article is not so limited—it protects all "[p]ersons taking no active part in the hostilities" in an armed conflict not of an international character.

Whatever might be the outer bounds of this category of covered persons, we do not think it could encompass al-Aulaqi. Common Article 3 does not alter the fundamental law-of-war principle concerning a belligerent party's right in an armed conflict to target individuals who are part of an enemy's armed forces. *See supra* at 23. The language of Common Article 3 "makes clear that members of such armed forces [of both the state and non-state parties to the conflict] . . . are considered as 'taking no active part in the hostilities' only once they have disengaged

---

[47] The operations in question here would not involve conduct covered by the Land Mine Protocol. And the articles of the Geneva Conventions to which the United States is currently a party *other than* Common Article 3, as well as the relevant provisions of the Annex to the Fourth Hague Convention, apply by their terms only to armed conflicts between two or more of the parties to the Conventions. *See, e.g.*, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955], art. 2, 6 U.S.T. 3316, 3406.

37

from their fighting function ('have laid down their arms') or are placed *hors de combat*; mere suspension of combat is insufficient." International Committee of the Red Cross, *Interpretive Guidance on the Notion of Direct Participation in Hostilities Under International Humanitarian Law* 28 (2009); *cf. also id.* at 34 ("individuals whose continuous function involves the preparation, execution, or command of acts or operations amounting to direct participation in hostilities are assuming a continuous combat function," in which case they can be deemed to be members of a non-state armed group subject to continuous targeting); *accord Gherebi v. Obama*, 609 F. Supp. 2d 43, 65 (D.D.C. 2009) ("the fact that 'members of armed forces who have laid down their arms and those placed *hors de combat*' are not 'taking [an] active part in the hostilities' necessarily implies that 'members of armed forces' who have not surrendered or been incapacitated are 'taking [an] active part in the hostilities' simply by virtue of their membership in those armed forces"); *id.* at 67 ("Common Article 3 is not a suicide pact; it does not provide a free pass for the members of an enemy's armed forces to go to or fro as they please so long as, for example, shots are not fired, bombs are not exploded, and places are not hijacked"). Al-Aulaqi, an active, high-level leader of an enemy force who is continually involved in planning and recruiting for terrorist attacks, can on that basis fairly be said to be taking "an active part in hostilities." Accordingly, targeting him in the circumstances posited to us would not violate Common Article 3 and therefore would not violate the War Crimes Act.

# VI.

We conclude with a discussion of potential constitutional limitations on the contemplated operations due to al-Aulaqi's status as a U.S. citizen, elaborating upon the reasoning in our earlier memorandum discussing that issue. Although we have explained above why we believe that neither the DoD or CIA operation would violate sections 1119(b), 956(a) and 2441 of title 18 of the U.S. Code, the fact that al-Aulaqi is a United States citizen could raise distinct questions under the Constitution. As we explained in our earlier memorandum, Barron Memorandum at 5-7, we do not believe that al-Aulaqi's U.S. citizenship imposes constitutional limitations that would preclude the contemplated lethal action under the facts represented to us by DoD, the CIA and the Intelligence Community.

Because al-Aulaqi is a U.S. citizen, the Fifth Amendment's Due Process Clause, as well as the Fourth Amendment, likely protects him in some respects even while he is abroad. *See Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (plurality opinion); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269-70 (1990); *see also In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 170 n.7 (2d Cir. 2008).

In *Hamdi*, a plurality of the Supreme Court used the *Mathews v. Eldridge* balancing test to analyze the Fifth Amendment due process rights of a U.S. citizen captured on the battlefield in Afghanistan and detained in the United States who wished to challenge the government's assertion that he was a part of enemy forces, explaining that "the process due in any given instance is determined by weighing 'the private interest that will be affected by the official action' against the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." 542 U.S. at 529 (plurality opinion) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

We believe similar reasoning supports the constitutionality of the contemplated operations here. As explained above, on the facts represented to us, a decision-maker could reasonably decide that the threat posed by al-Aulaqi's activities to United States persons is "continued" and "imminent"

In addition to the nature of the threat posed by al-Aulaqi's activities, both agencies here have represented that they intend to capture rather than target al-Aulaqi if feasible; yet we also understand that an operation by either agency to capture al-Aulaqi in Yemen would be infeasible at this time.

*Cf.*, *e.g.*, *Public Committee Against Torture in Israel v. Government of Israel*, HCJ 769/02 ¶ 40, 46 I.L.M. 375, 394 (Israel Supreme Court sitting as the High Court of Justice, 2006) (although arrest, investigation and trial "might actually be particularly practical under the conditions of belligerent occupation, in which the army controls the area in which the operation takes place," such alternatives "are not means which can always be used," either because they are impossible or because they involve a great risk to the lives of soldiers).

Although in the "circumstances of war," as the *Hamdi* plurality observed, "the risk of erroneous deprivation of a citizen's liberty in the absence of sufficient process . . . is very real," 542 U.S. at 530, the plurality also recognized that "the realities of combat" render certain uses of force "necessary and appropriate," including against U.S. citizens who have become part of enemy forces—and that "due process analysis need not blink at those realities," *id.* at 531. we conclude that at least where, as here, the target's activities pose a "continued and imminent threat of violence or death" to U.S. persons, "the highest officers in the Intelligence Community have reviewed the factual basis" for the lethal operation, and a capture operation would be infeasible—and where the CIA and DoD "continue to monitor whether changed circumstances would permit such an alternative," *see also DoD May 18 Memorandum for OLC* at 2—the "realities of combat" and the weight of the government's interest in using an authorized means of lethal force against this enemy are such that the Constitution would not require the government to provide further process to the U.S. person before using such force. *Cf. Hamdi* 542 U.S. at 535 (noting that Court "accord[s] the greatest respect and consideration to the judgments of military

authorities in matters relating to the actual prosecution of war, and . . . the scope of that discretion necessarily is wide") (plurality opinion).

Similarly, assuming that the Fourth Amendment provides some protection to a U.S. person abroad who is part of al-Qaida and that the operations at issue here would result in a "seizure" within the meaning of that Amendment,                                The Supreme Court has made clear that the constitutionality of a seizure is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted); *accord Scott v. Harris*, 550 U.S. 372, 383 (2007). Even in domestic law enforcement operations, the Court has noted that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. Thus, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape and if, where feasible, some warning has been given." *Id.* at 11-12.

The Fourth Amendment "reasonableness" test is situation-dependent. *Cf. Scott*, 550 U.S. at 382 (*Garner* "did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force'"). What would constitute a reasonable use of lethal force for purposes of domestic law enforcement operations will be very different from what would be reasonable in a situation like such as that at issue here. In the present circumstances, as we understand the facts, the U.S. citizen in question has gone overseas and become part of the forces of an enemy with which the United States is engaged in an armed conflict; that person is engaged in continual planning and direction of attacks upon U.S. persons from one of the enemy's overseas bases of operations; the U.S. government does not know precisely when such attacks will occur; and a capture operation would be infeasible.                        . at least where high-level government officials have determined that a capture operation overseas is infeasible and that the targeted person is part of a dangerous enemy force and is engaged in activities that pose a continued and imminent threat to U.S. persons or interests                                        the use of lethal force would not violate the Fourth Amendment.                                                                and thus that the intrusion on any Fourth Amendment interests would be outweighed by "the importance of the governmental interests [that] justify the intrusion," *Garner*, 471 U.S. at 8, based on the facts that have been represented to us.

Please let us know if we can be of further assistance.

David J. Barron
Acting Assistant Attorney General

A TRUE COPY
Catherine O'Hagan Wolfe, Clerk

by Catherine O'Hagan Wolfe

DEPUTY CLERK

CERTIFIED: April 21, 2014 colur